UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

John Dasta,

      Plaintiff,

 vs.

Bobby Shearin, Dr. Leonardo
F. Giron, Julie Hayes, Howard
Nelson, and Bernie Richards,
in their official and individual
capacities,

      Defendants.    Civ. No. 04-4475 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Motion of the Defendants Warden Bobby P. Shearin

("Shearin"), Dr. Leonardo F. Giron ("Dr. Giron"), Officer Julie Hayes ("Hayes"),

Officer Howard Nelson ("Nelson"), and Officer Bernie Richards ("Richards"), for

Summary Judgment, and upon the Motion of the Defendants Dr. Giron, and Shearin, to Dismiss. For these purposes, the Plaintiff John Dasta ("Dasta") appears <u>pro se</u>, and the Defendants appear by Lonnie F. Bryan, Assistant United States Attorney.

For reasons which follow, we recommend that the Motion of Dr. Giron and Shearin to Dismiss be granted, but only to the extent of allowing the transfer of those claims to the District of Maryland, Baltimore (Northern) Division, which has the proper venue; and that the Motion of Hayes, Nelson, and Richards, for Summary Judgment be granted.

## II. <u>Factual and Procedural History</u>

Dasta, who is a Federal prisoner, commenced this action under <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), alleging, in part, that he received inadequate medical care during his confinement at the Federal Correctional Institution, in Cumberland, Maryland ("FCI-Cumberland"), and at the Federal Medical Center, in Rochester, Minnesota ("FMC-Rochester"). Dasta's initial Amended Complaint was summarily dismissed pursuant to Title 28 U.S.C. §1915A(b), upon a finding that Dasta had not presented an actionable claim. Subsequently, our Court of Appeals affirmed the dismissal of a number of the originally-named Defendants, but concluded that Dasta should be allowed to pursue

- 2 -

some of the claims set forth in his Amended Complaint against Dr. Giron, Shearin, Hayes, Nelson, and Richards. See, Dasta v. LeBlanc, 132 Fed.Appx. 98, 99 (8th Cir. 2005).

Dasta subsequently moved the District Court for the appointment of counsel. On June 2, 2006, the District Court denied his Motion, and Dasta appealed that ruling to our Court of Appeals. The Court of Appeals affirmed the Order of the District Court, and issued its mandate on September 18, 2007. See, Dasta v. Shearin, 230 Fed.Appx. 635 (8th Cir., July 27, 2007); see also, Mandate, Docket No. 121. While Dasta's appeals were pending, on December 23, 2006, the Defendants filed their joint Motion to Dismiss, and for Summary Judgment.[1]

We proceed to the facts which underlie Dasta's claims. In November of 2001, when Dasta was confined at the Allegheny County Jail, in Pittsburgh, Pennsylvania, he

---

[1]We note that Dasta filed a Cross-Motion for Summary Judgment on March 20, 2006. See, Docket No. 122. However, Dasta asserts that there are genuine issues of material fact in both his Cross-Motion, and in his Memorandum in opposition to the Defendants' Motion for Summary Judgment. Id.; Plaintiff's Memorandum in Opposition, Docket No. 84, at 1-2. He also demands a Trial on his claims. See, Plaintiff's Memorandum in Opposition, supra, at 4, 13, 16. Accordingly, we conclude that he does not, in fact, seek Summary Judgment as to his claims. However, to the extent that Dasta does seek Summary Judgment in his favor, we recommend that his Motion be denied, for the reasons detailed in this Opinion.

slipped and fell in the shower, landing on his left side and injuring his back.  See,

Declaration of John Dasta ("Dasta Decl."), Docket No. 36, at ¶4; Plaintiff's Exhibits,

Docket No. 36, at Exhibit 7; Defendants' Exhibits, Docket No. 74, Exhibit 1 ("Exhibit

1"), at AFF109, Exhibit 3 ("Exhibit 3"), at MR076; Declaration of Dr. Leonardo Giron

("Dr. Giron Decl."), Docket No. 62, at ¶3; Declaration of Ann C. Kinyon ("Kinyon

Decl."), Docket No. 60, at ¶4.  Dasta was admitted to the Jail's infirmary for medical

treatment.  He was treated with bed rest, Flexeril,[2] and Motrin.  See, Dasta Decl.,

supra, at ¶¶10, 11, 18, 37, 46; Exhibit 1, supra, at AFF109-120.

On December 17, 2001, lumbar x-rays of Dasta showed anterolithesis, or

spondylolisthesis,[3] resulting in a diagnosis of lower back strain.  See, Dasta Decl.,

supra, at ¶¶45-52; Exhibit 1, supra, at AFF121.  Although Dasta continued to

---

[2]Although records submitted by the Defendants identify this drug as "Fexeril" on at least one (1) occasion, we presume this is a typographical error as no such medication exists, and since the records also refer more accurately to "Flexeril."  See, e.g., Exhibit 3, supra, at MR269.

Flexeril is indicated as an adjunct to rest, and physical therapy, for relief of muscle spasm associated with acute, painful musculoskeletal conditions.  See, Physician's Desk Reference, pp. 1833 (60th ed. 2006).

[3]Spondylolisthesis is the "forward displacement * * * of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth[.]"  Dorland's Illustrated Medical Dictionary, at 1684 (29th Ed. 2000).

complain of back pain, infirmary staff observed him "walking, twisting [and] turning in manners inconsistent with his complaints," with no apparent discomfort.   See, Exhibit 1, supra, at AFF122.   In January of 2002, Dasta was referred for physical therapy, and by February of 2002, he was reporting improvement.   Id. at AFF123-126. On March 8, 2002, preparations were made for Dasta's transport to a Federal prison. Id. at AFF132. A registered nurse concluded that Dasta did not require any medical equipment during his transport.   Id.

On March 18, 2002, Dasta was first confined at FCI-Cumberland.   At the time of his admission, he underwent a physical examination, during which he complained of lower back pain with left radiculopathy,[4] which he described as pinched nerves. See, Dasta Decl., supra, at ¶¶208-210; Dr. Giron Decl., supra, at ¶3; Kinyon Decl., supra, at ¶4; Exhibit 1, supra, at AFF134.   Dasta received prednisone,[5] and underwent another lumbar x-ray, which again showed spondylolisthesis of the L4-L5 vertebrae.

---

[4]Radiculopathy is a disease of the nerve roots and nerve.   See, Dorland's Illustrated Medical Dictionary, at 1511 (29th Ed. 2000).

[5]Prednisone is "administered orally as an anti-inflammatory and immunosuppressant in a wide variety of disorders."   Dorland's Illustrated Medical Dictionary, at 1450 (29th Ed. 2000).

See, Dasta Decl., supra, at ¶¶208-210; Dr. Giron Decl., supra, at ¶3; Kinyon Decl., supra, at ¶4; Exhibit 1, supra, at AFF136.

On April 12, 2002, the Associate Warden sent Dasta to the facility's Health Services Unit (the "HSU"), after Dasta complained of severe lower back pain. See, Dasta Decl., supra, at ¶218; Dr. Giron Decl., supra, at ¶3; Kinyon Decl., supra, at ¶4; Exhibit 1, supra, at AFF139-140. Based upon Dasta's self-reported history of chronic lower back pain, the HSU physician concluded that Dasta was suffering mild distress with possible nerve impingement. Accordingly, Dasta was referred to the Chronic Care Clinic (the "CCC") at FCI-Cumberland, where he was seen on April 15, 2002, by the Dr. Giron, who is a physician and the Clinical Director at FCI-Cumberland. Dr. Giron examined Dasta, and found that his back was tender, due to his 2001 slip-and-fall. Dr. Giron recommended daily walking, weight reduction, and Motrin for pain relief. He also referred Dasta to an orthopedist for consultation. See, Dasta Decl., supra, at ¶¶218-220; Dr. Giron Decl., supra, at ¶4; Kinyon Decl., supra, at ¶5; Exhibit 1, supra, at AFF140-141.

During this timeframe, Dasta also filed an administrative grievance, complaining that he suffered from constant back pain, and that the prednisone had not eased his symptoms. Dasta requested an MRI. In response to the grievance, a correctional

counselor noted that Dasta had been seen by physicians at FCI-Cumberland, and that he had been referred for an orthopedic consultation.  See, Exhibit 1, supra, at AFF143; Dasta Decl., supra, at ¶¶223-231.

On May 3, 2002, Dasta returned to Dr. Giron, complaining of left buttock pain and left medial thigh pain, though he was not in acute distress, and was only minimally tender.  Dr. Giron refilled Dasta's prescription for glyburide,[6] and started him on Neurontin.[7]  See, Dasta Decl., supra, at ¶221; Dr. Giron Decl., supra, at ¶4; Kinyon Decl., supra, at ¶5; Exhibit 1, supra, at AFF142.  On May 21, 2002, at Dasta's request, he received a full copy of his medical records from FCI-Cumberland.  See, Exhibit 1, supra, at AFF142, 152-153, 160; Dasta Decl., supra, at ¶260.  At this time, Dasta filed an administrative request, stating that his back condition was getting worse, and made it difficult for him to walk up stairs.  Dasta asked to have his condition corrected.   Id. at AFF145.

---

[6]Glyburide is "used as a hypoglycemic in the treatment of type 2 diabetes[.]" Dorland's Illustrated Medical Dictionary, at 758 (29th Ed. 2000).  Dasta has been diagnosed with diabetes.  See, Exhibit 1, supra, at AFF132; Exhibit 3, supra, at MR228.

[7]Neurontin is administered in the management of postherpetic neuralgia in adults. See, Physician's Desk Reference, pp. 2500 (60th ed. 2006).

Dasta's son, Thomas M. Dasta ("Thomas"), also sent a letter to Shearin, expressing his concern that Dasta's chronic back and leg pain, as well as his diabetes and gout, had not been treated since Dasta's arrival at FCI-Cumberland.  Id. at AFF147-149.   Thomas stated that his brother, and their cousin, who were both chiropractors, were willing to treat Dasta at no cost, or that Thomas would personally pay for Dasta's treatment.   Id. at AFF149.   Shearin responded to Dasta's administrative request on May 21, 2002, stating that Dasta was already scheduled for an orthopedic consultation, and that Shearin would await the clinical recommendation on Dasta's continued care.  Id. at AFF146.  On May 28, 2002, Shearin also replied by letter to Thomas, outlining the medical care that Dasta had already received at FCI-Cumberland for all of his medical conditions, and noting the pending orthopedic consultation for Dasta's back condition.  Shearin stated that BOP policy precluded family members from paying for an inmate's treatment.  He also stated that Dasta's medical conditions were being continually monitored.  See, id. at AFF150-151.

On May 25, 2002, Dasta attended his orthopedic consultation.  The orthopedist diagnosed Dasta with a lumbar strain, spondylolisthesis of the L4-L5 vertebra, and radiculopathy.   The orthopedist recommended non-steroidal, anti-inflammatory medication.  Dasta was taking Motrin and Neurontin, as well as a muscle relaxant, and

Baclofen.[8]  See, <u>Dasta Decl.</u>, supra, at ¶234; <u>Dr. Giron Decl.</u>, supra, at ¶5; <u>Exhibit 1</u>, supra, at AFF144.  The orthopedist recommended a neurosurgery consultation, and Dr. Giron made that referral.   See, <u>Dr. Giron Decl.</u>, supra, at ¶5; <u>Exhibit 3</u>, supra, at MR292.

On a follow-up visit to Dr. Giron on May 31, 2002, Dasta again complained of lower back pain, though the Neurontin had eased his symptoms.  Dr. Giron found that Dasta's back remained mildly tender, but that he was not in acute distress.  Dr. Giron increased the dosage of Dasta's Neurontin and Motrin.  See, <u>Dasta Decl.</u>, supra, at ¶266; <u>Dr. Giron Decl.</u>, supra, at ¶5; <u>Exhibit 1</u>, supra, at AFF161.  On June 13, 2002, Dasta returned to the clinic, upset that he had not received a copy of the records from his orthopedic consultation of May 25, 2002.  He received a copy on June 13, 2002.  See, <u>Dr. Giron Decl.</u>, at ¶6.

On July 9, 2002, Dasta attended his neurosurgery consultation.   The neurosurgeon, Dr. Kheder Ashker ("Dr. Ashker"), examined Dasta and concluded that he might be suffering a herniated disk at the L4-L5 vertebrae.   Dr. Ashker

---

[8]Baclofen is "used as a muscle relaxant and antispastic in the treatment of multiple sclerosis, spinal cord diseases, and spinal cord injury[.]"  <u>Dorland's Illustrated Medical Dictionary</u>, at 185 (29th Ed. 2000).

recommended an MRI, which Dr. Giron ordered on July 11, 2002.  See, <u>Dasta Decl.</u>, supra, at ¶¶280, 283-85; <u>Dr. Giron Decl.</u>, supra, at ¶6; <u>Kinyon Decl.</u>, supra, at ¶6; <u>Exhibit 1</u>, supra, at AFF169.

Dasta's MRI was conducted on July 30, 2002.  The results revealed spondylolisthesis at the L4-L5 vertebrae, as well as compression of the nerve roots at that level.  It also revealed mild compression of the nerve roots at the L3-L4 vertebrae. See, <u>Dasta Decl.</u>, supra at ¶¶294, 297; <u>Exhibit 1</u>, supra, at AFF171-172.  On the same day, Dasta requested a second mattress for his bunk, in order to ease his back pain. A health services administrator declined the request, concluding that Dasta's records did not demonstrate his need for a second mattress.  See, <u>Dasta Decl.</u>, supra, at ¶¶298-299; <u>Exhibit 1</u>, supra, at AFF173.  On the same day, Dasta also attended sick call, complaining that his back pain had increased in intensity.  He did not claim any new injury or trauma, nor was he in acute distress.  He was able to walk slowly but steadily, though he reported pain down his left posterior thigh.  Dasta's dosage of Neurontin[9] was increased.  See, <u>Dasta Decl.</u>, supra, at ¶¶305-07; <u>Dr. Giron Decl.</u>,

_____

[9]The Record in this instance refers to "gabapertin."  We presume that this is a typographical error, which should read "gabapentin," which is a generic name for Neurontin.  See, <u>Physician's Desk Reference</u>, pp. 2498 (60th ed. 2006).

supra, at ¶7; <u>Kinyon Decl.</u>, supra, at ¶7; <u>Exhibit 1</u>, supra, at AFF174.  On August 5,

2002, Dasta received a copy of his neurological consultation, and his MRI report.

See, <u>Dasta Decl.</u>, supra, at ¶309; <u>Exhibit 1</u>, supra, at AFF174.

On August 19, 2002, at a follow-up visit with Dr. Giron, Dasta reported that the

Neurontin had provided some relief, though he still had intermittent lower back pain

as well as pain radiating to his left lower extremity.  His medications were renewed, and

he was instructed to continue his diet and exercise regimen.  See, <u>Dr. Giron Decl.</u>,

supra, at ¶8; <u>Kinyon Decl.</u>, supra, at ¶7; <u>Exhibit 1</u>, supra, at AFF175.

On August 28, 2002, Dr. Ashker conducted a follow-up visit, at which he

examined Dasta, and reviewed his MRI results.  Dr. Ashker recommended that Dasta

undergo surgery, for a lumbar laminectomy,[10] and discectomy,[11] and for fusion of the

L4-L5 vertebrae.  As a result, Dr. Ashker recommended that Dasta be transferred to

another Bureau of Prisons facility, where the surgery was more commonly performed.

See, <u>Dasta Decl.</u>, supra, at ¶¶320-325; <u>Dr. Giron Decl.</u>, supra, at ¶8; <u>Exhibit 1</u>, supra,

at AFF180.  Dr. Ashker also initially prescribed a lumbrosacral back brace (the

---

[10]A laminectomy is the "excision of the posterior arch of a vertebra." <u>Dorland's Illustrated Medical Dictionary</u>, at 960 (29th Ed. 2000).

[11]A discectomy, or diskectomy, is the "excision of an intervertebral disk[.]" <u>Dorland's Illustrated Medical Dictionary</u>, at 526 (29th Ed. 2000).

"brace") to relieve Dasta's symptoms.  See, <u>Dasta Decl.</u>, supra, at ¶325; <u>Exhibit 1</u>, supra, at AFF180.

On September 10, 2002, and September 27, 2002, Dasta filed administrative requests for the brace.  See, <u>Dasta Decl.</u>, supra, at ¶339; <u>Exhibit 1</u>, supra, at AFF214, 219, 220.  However, by letter dated September 30, 2002, Dr. Ashker informed medical staff at FCI-Cumberland that the brace was not required, prior to Dasta's surgery, as it would only treat his symptoms, and not his underlying back condition.  See, <u>Exhibit 3</u>, supra, MR192-93; <u>Exhibit 1</u>, supra, at AFF221; <u>Dasta Decl.</u>, supra, at ¶¶365-369, 385.  Around the same time, Dr. Giron initiated the process for a surgery consultation and a transfer, based upon Dr. Ashker's recommendations.  See, <u>Dr. Giron Decl.</u>, supra, at ¶8; <u>Kinyon Decl.</u>, supra, at ¶8; <u>Exhibit 3</u>, supra, at MR285.

On October 24, 2002, Dasta was transferred from FCI-Cumberland, to FMC-Rochester, for evaluation and treatment of his back condition.  See, <u>Declaration of David Edwardy ("Edwardy Decl.")</u>, <u>Docket No. 63</u>, at ¶4; <u>Kinyon Decl.</u>, supra, at ¶8. The instructions relating to his transfer stated that no medical equipment was required during transport, but that Dasta's back pain might restrict the length of time that Dasta could spend traveling.  He was directed to change position every hour, or as needed. See, <u>Dasta Decl.</u>, supra, at ¶384; <u>Exhibit 1</u>, supra, at AFF235.

In the interim, Dasta's attorney wrote to Dr. Ashker to ask about his prescription for the brace.  On October 30, 2002, Dr. Ashker wrote in reply, stating that Dasta would be transferred soon to receive surgery.  Dr. Ashker further stated that Dasta might benefit from using the previously prescribed brace, but that it was not immediately necessary.  Dr. Ashker stated that a different type of brace might be required, depending on Dasta's surgery.  Dr. Ashker also stated that, if Dasta's "surgical appointment is delayed for weeks or months obviously [Dasta] should be on a brace[.]"  See, Exhibit 1, supra, at AFF236; Dasta Decl., supra, at ¶385.  However, once Dasta was at FMC-Rochester, he was referred to a physical therapist, who determined that physical therapy would be used in lieu of a back brace.  Dasta showed some improvement with his physical therapy program.  See, Edwardy Decl., supra, at ¶6; Dasta Decl., supra, at ¶396.

FMC-Rochester referred Dasta to a number of specialists at the Mayo Clinic, which provides specialty medical services on contract to FMC-Rochester.  See, Edwardy Decl., supra, at ¶¶4-5.  The Mayo Clinic specialists first tried a number of non-surgical programs to treat Dasta's condition.  On December 11, 2002, a neurologist at the Mayo Clinic examined Dasta, and reviewed his prior MRI.  The neurologist found that the MRI showed a possibility of radiculopathy, but was not

definitive, though it did show spondylolisthesis.   The neurologist also noted that Dasta's history, and examination, suggested mild peripheral neuropathy.[12]   The neurologist recommended further evaluation, and a continuation of Dasta's program for pain control and therapy.  See, <u>Kinyon Decl.</u>, supra, at ¶8;  <u>Exhibit 3</u>, supra, at MR278-80; <u>Dasta Decl.</u>, supra, at ¶405.

On February 5, 2003, Dasta underwent electromyography[13] at the Mayo Clinic, the results of which were consistent with radiculopathy at the L5 vertebra.  See, <u>Exhibit 1</u>, supra, at AFF265; <u>Dasta Decl.</u>, supra, at ¶¶414-416.

On February 27, 2003, Dasta went to the Mayo Clinic Spine Center, complaining of back pain and left leg pain.  Based on a review of Dasta's x-rays and MRI, and his diagnosis of spondylolithesis, Dasta was referred to an orthopedic spine surgeon for consultation.  See, <u>Kinyon Decl.</u>, supra, at ¶9; <u>Exhibit 3</u>, supra, at MR272-74.

---

[12]Peripheral neuropathy, or polyneuropathy, is the "neuropathy of several peripheral nerves simultaneously."  <u>Dorland's Illustrated Medical Dictionary</u>, at 1432 (29th Ed. 2000).   Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system[.]"  <u>Id.</u> at 1212.

[13]Electromyography is "an electrodiagnostic technique for recording the extracellular activity * * * of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation[.]"  <u>Dorland's Illustrated Medical Dictionary</u>, at 576-77 (29th Ed. 2000).

On April 15, 2003, Dasta attended his orthopedic surgery consultation. The surgeon believed that Dasta was suffering from degenerative disc disease, spondylolisthesis, and radiculopathy. The surgeon referred Dasta to the Pain Clinic for nerve blocks. He also recommended a neurology evaluation, and a nonoperative program with injections. See, Kinyon Decl., supra, at ¶10; Exhibit 3, supra, at MR269; Dasta Decl., supra, at ¶417.

On May 7, 2003, Dasta attended his neurology evaluation. He reported that physical therapy had relieved his pain. The neurologist agreed with the recommendation to pursue nerve blocks, and also discussed the possibility of lumbar spine surgery with Dasta, though Dasta agreed to the nerve blocks. See, Kinyon Decl., supra, at ¶11; Exhibit 3, supra, at MR265; Dasta Decl., supra, at ¶¶422-423.

On June 5, 2003, Dasta underwent nerve blocks for pain management, and received an epidural steroid injection. See, Kinyon Decl., supra, at ¶11; Exhibit 3, supra, at MR245, 258; Dasta Decl., supra, at ¶428. Dasta expressed interest in surgery but, apparently, understood that a more conservative treatment program was recommended. See, Exhibit 3, supra, at MR245, 261; Dasta Decl., supra, at ¶428. Dasta contends that his doctors chose conservative treatments, and that he would have preferred surgery at that point. See, Dasta Decl., supra, at ¶432.

On June 10, 2003, Dasta went for a follow-up visit at the Spine Center.  The surgeon continued to recommend a nonsurgical treatment plan.  See, <u>Kinyon Decl.</u>, supra, at ¶12; <u>Exhibit 3</u>, supra, at MR252; <u>Dasta Decl.</u>, supra, at ¶439.  On July 1, 2003, Dasta received additional facet injections for pain management.  See, <u>Exhibit 3</u>, supra, at MR245; <u>Dasta Decl.</u>, supra, at ¶¶443, 445.  On July 15, 2003, Dasta went to another follow-up visit at the Spine Center.  Dasta stated that he did not want any additional injections at that time.  The injections from July 1, 2003, proved effective for Dasta's pain management for approximately six (6) weeks, before his pain returned in September of 2003.  Dasta informed his physician that he wanted to pursue surgery.  See, <u>Kinyon Decl.</u>, supra, at ¶12; <u>Exhibit 3</u>, supra, at MR226-27, 245; <u>Dasta Decl.</u>, supra, at ¶¶447, 456.  Dasta was issued a four-wheeled walker to assist his mobility, and his physician arranged for a surgery consultation.  See, <u>Exhibit 3</u>, supra, at MR246; <u>Dasta Decl.</u>, supra, at ¶¶459-60, 464.  Dasta also received Oxycodone[14] for pain relief.  See, <u>Dasta Decl.</u>, supra, at ¶474; <u>Exhibit 3</u>, supra, at MR343-53. During

---

[14]Oxycodone, which goes by the brand name Percodan, is used for the relief of moderate to moderately severe pain.  See, <u>Physician's Desk Reference</u>, pp. 1115 (60th ed. 2006).

this same timeframe, on August 12, 2003, Dasta underwent surgery at the Mayo Clinic, for the removal of a kidney stone.  See, <u>Plaintiff's Exhibits</u>, supra, Exhibit 184.

On October 21, 2003, Dasta went for a follow-up visit at the Spine Center.  The surgeon planned to obtain additional plain films, and an MRI scan, in order to assess Dasta's discs and the progression of his condition.  See, <u>Kinyon Decl.</u>, supra, at ¶13; <u>Exhibit 3</u>, supra, at MR242.  On November 14, 2003, Dasta was evaluated at the Spine Center.  His MRI scan was unchanged.  The surgeon discussed the risks of surgery with Dasta, who still wanted to pursue surgery so as to improve his lower extremity pain.  According to his medical records, Dasta acknowledged that surgery was not urgent or mandatory, and that his physicians could not promise an improvement of his back pain.  See, <u>Kinyon Decl.</u>, supra, at ¶13; <u>Exhibit 3</u>, supra, at MR226-27, 241; <u>Dasta Decl.</u>, supra, at ¶¶479-484.  Dasta contends that he believed his need for surgery was urgent.  See, <u>Dasta Decl.</u>, supra, at 483.

On December 19, 2003, Dasta attended a consultation with an orthopedic surgeon at the Mayo Clinic.  Dasta again acknowledged that his surgeon could not promise an improvement of his back pain.  See, <u>Kinyon Decl.</u>, supra, at ¶14; <u>Exhibit 3</u>, supra, at MR239; <u>Dasta Decl.</u>, supra, at ¶489.  Around this time, Dasta was

prescribed Methadone[15] for pain relief.  See, Exhibit 3, supra, at MR339-43; Dasta Decl., supra, at ¶501.  Dasta was originally scheduled for surgery on December 29, 2003.  See, Exhibit 3, supra, at MR239; Dasta Decl., supra, at ¶491.  However, because Dasta was suffering from a severe cold, the surgeon concluded that surgery would have to be postponed.  See, Dasta Decl., supra, at ¶499; Plaintiff's Exhibits, supra, Exhibits 166, 183, 184.  Dasta contends that he became ill because correctional officers placed him in a cold room the night before his surgery for inappropriate disciplinary reasons, and because he was transported in cold weather without a coat. See, Dasta Decl., supra, at ¶¶491, 496-98.  The Warden at FMC-Rochester denied Dasta's allegation, stating in a letter dated October 26, 2004, that Dasta presented at sick call five (5) days before his scheduled surgery, on December 24, 2003, with symptoms of a cold, including a runny nose and sore throat.  See, Plaintiff's Exhibits, supra, Exhibit 184.

On January 27, 2004, Dasta underwent surgery and suffered no complications. See, Kinyon Decl., supra, at ¶14; Exhibit 3, supra, at MR211-12.  In his postoperative

---

[15]Methadone is a "synthetic narcotic, possessing pharmacologic actions similar to those of morphine and heroin," and is used as an analgesic.  Dorland's Illustrated Medical Dictionary, at 1098 (29th Ed. 2000).

examination, Dasta reported no acute distress, and on January 31, 2004, he was walking, though he favored one leg. See, Exhibit 3, supra, at MR212. Dasta received a back brace, called a Freeman corset (the "corset"), and was directed to wear it for three (3) months, at which time, he would gradually reduce his use of the corset. See, Exhibit 3, supra at MR213-14; Exhibit 1, supra, at AFF533. Dasta was also advised to refrain from lifting more than five (5) pounds, or from twisting or bending. See, Exhibit 3, supra, at MR213-14. Dasta's physician recommended walking several times daily for exercise, and noted that Dasta had used a four-wheeled walker prior to his surgery. See, Exhibit 3, supra, at MR213-15.

Dasta's physician further recommended physical and occupational therapy. Dasta was prescribed Oxycodone to relieve his pain during recovery. See, Exhibit 2, supra, at CRMC040. Dasta was issued an extra pillow, for use between his legs while sleeping, so as to relieve his discomfort. See, id. at CRMC026, 040. Dasta also received an idle[16] for a hospital bed during the duration of his stay at FMC-Rochester. See, Plaintiff's Exhibits, supra, Exhibit 163. Dasta's discharge report makes no mention of a wheelchair. See, Exhibit 3, supra, at MR211-15. In fact, Dasta was able

---

[16]An "idle" appears to be the term used at FMC-Rochester for special medical restrictions or accommodations.

to walk steadily within a few days of his surgery. See, Exhibit 2, supra, CRMC049-55. Dasta contends that he suffered excruciating pain following his surgery. See, Dasta Decl., supra, at ¶¶527-28, 537-38.

On April 27, 2004, Dasta was transported to the Mayo Clinic for a follow-up visit. The Defendants Nelson, and Richards, conducted Dasta's transport. Nelson is a Senior Officer Specialist at FMC-Rochester, and Richards is a Security Guard there. See, Declaration of Harold Nelson ("Nelson Decl."), Docket No. 66, at ¶1; Declaration of Bernard Richards ("Richards Decl."), Docket No. 67, at ¶1. Dasta asserts that he was improperly transported because he was not provided with a wheelchair, and that he incurred pain to his back and shoulder as a result.[17] See, Exhibit 1, supra, at AFF378-382; Dasta Decl., supra, at ¶¶539-544.

When inmates are transported to medical appointments, the officers receive instructions from health care professionals whenever any special procedures are required, due to the inmates' medical conditions. See, Nelson Decl., supra, at ¶¶3-4,

---

[17]During Dasta's postoperative examination in January of 2004, he informed medical staff that he suffered from pain in his right shoulder, due to a fall several months prior to his back surgery. See, Exhibit 3, supra, at MR212-13. His injury was determined to be a rotator cuff strain, and physical therapy was recommended. Id. at MR212.

7; <u>Richards Decl.</u>, supra, at ¶3-4, 8.   The instructions for Dasta's transport did not

require the use of a wheelchair, nor did they restrict the officers' abilities to use

Dasta's arms or shoulders.   See, <u>Nelson Decl.</u>, supra, at ¶3; <u>Richards Decl.</u>, supra,

at ¶3.   Accordingly, most of Dasta's transport did not involve the use of a wheelchair,

as Dasta had been recovering well, and was walking regularly, up to three (3) miles per

day in total.   See, <u>Exhibit 1</u>, supra, at AFF533; <u>Edwardy Decl.</u>, supra, at ¶5; <u>Nelson

Decl.</u>, supra, at ¶5.

Nelson and Richards aver that Dasta did not fall, or show abnormal difficulty,

when he was walked to the transport van in his restraints.   See, <u>Nelson Decl.</u>, supra,

at ¶5; <u>Richards Decl.</u>, supra, at ¶5.   Dasta contends, in contrast, that his legs buckled

as he walked from the van to the clinic, which required Nelson and Richards to

support him by his arms.[18]   See, <u>Dasta Decl.</u>, supra, at ¶541.   Dasta did have difficulty

getting into a seat in the van.   See, <u>Nelson Decl.</u>, supra, at ¶5; <u>Richards Decl.</u>, supra,

at ¶5; <u>Dasta Decl.</u>, supra, at ¶540.   Dasta also used a wheelchair once he entered the

clinic, per regular procedure.   See, <u>Nelson Decl.</u>, supra, at ¶5; <u>Richards Decl.</u>, supra,

at ¶5.

---

[18]Dasta's custody and security level required the use of restraints during his
transport.  See, <u>Nelson Decl.</u>, supra, at ¶4 n.1; <u>Richards Decl.</u>, supra, at ¶4 n.1.

Although Dasta claims that he informed the doctor that he was injured during transport, see, Exhibit 1, supra, at AFF528, the report from his orthopedic surgeon makes no such reference. Id. at AFF533; Edwardy Decl., at ¶5. Nelson avers that, during the appointment, Dasta made no report of injury or pain, based on the method of his transport. See, Nelson Decl., at ¶5. According to his medical records, Dasta informed the surgeon, at his appointment, that he had very little back or leg pain, though he suffered some pain in his anterior thighs. See, Kinyon Decl., at ¶15; Exhibit 1, supra, at AFF533; Exhibit 3, supra, at MR233. Radiographs taken at his appointment showed that the fusion was "healing well in good alignment[.]" Exhibit 1, supra, AFF533.

Two weeks later, on May 10, 2004, Dasta responded to sick call to complain that he had been injured during his transport.[19] See, Exhibit 1, supra, at AFF384, 398-399; Exhibit 2, supra, at CRMC034. At that time, an x-ray was ordered, and showed that the fusion was healing well. See, Kinyon Decl., at ¶15; Exhibit 1, supra, at

---

[19]The doctor who treated Dasta at sick call recorded that Dasta had slipped on April 27, 2004, on the way to his medical appointment. Dasta contends, however, that he told the doctor that he had been mishandled during the transport, and that he was denied a wheelchair. See, Exhibit 1, supra, at AFF398.

AFF384, 398.  Medical staff also noted that Dasta was able to walk briskly in his unit, and on the facility compound.  See, <u>Exhibit 1</u>, supra, at AFF384.

On July 30, 2004, Dasta attended his six (6) month postoperative visit at the Mayo Clinic.  At that time, Dasta's back pain was mild, and he took ibuprofen occasionally to ease his discomfort.  Dasta reported no pain in his left leg.  Dasta's post-operative diagnosis was excellent, and x-rays showed that the fusion was solid. Dasta's physician noted that Dasta was very pleased with the surgery.  See, <u>Kinyon Decl.</u>, at ¶16; <u>Exhibit 3</u>, supra, at MR232.

During the time that Dasta was confined at FMC-Rochester, he contends that he was the subject of several improper searches by Hayes, who is a Senior Correctional Officer at FMC-Rochester.  See, <u>Declaration of Julie Hayes ("Hayes Decl.")</u>, supra, at ¶1.  A review of the Record shows that, on May 30, 2003, Hayes searched Dasta's cell at 3:00 o'clock a.m., and confiscated a pink bowl.  See, <u>Exhibit 1</u>, supra, at AFF326.  Dasta filed an administrative grievance against Hayes, based on that search, alleging that he felt vulnerable during the search.  <u>Id.</u>  Hayes acknowledges that she was aware of Dasta's grievance.  See, <u>Hayes Decl.</u>, at ¶4.  Through subsequent grievances, Dasta alleged that Hayes conducted three (3) searches in retaliation for his grievance, on three (3) separate dates: January 24, 2004, March 28,

2004, and May 23, 2004.  See, Exhibit 1, supra, at AFF322-324, 327, 328; Hayes

Decl., at ¶4.

Dasta contends that the search on January 24, 2004, also occurred at 3:00

o'clock a.m., and that Hayes confiscated a "cookie bowl."  See, Exhibit 1, supra, at

AFF322.  Dasta filed grievances relating to each of those searches.  See, Exhibit 1,

supra, at AFF322, 328, 464, 466.  He now asserts that Hayes conducted all of the

searches in order to harass him, in retaliation for his grievances.  Id. at AFF324.  Dasta

also asserts that Hayes' searches disturbed his sleep for "frivolous" rules violations.

Id. at AFF324, 328.  Dasta avers that he suffers from extreme back pain while he

sleeps, and he states that he was unable to fall back asleep after Hayes' searches.  Id.

at AFF327-28.  Dasta contends that Hayes should have waited until later in the

morning to conduct her searches.  Id. at AFF328-29.

For her part, Hayes denies conducting any search of Dasta's cell on January 24,

2004.[20]  See, Hayes Decl., at ¶54.  Hayes acknowledges that she searched Dasta's cell

_____

[20]Although the Defendants submitted a "Shakedown Log" from FMC-
Rochester as part of their Exhibits, see, Castaneda Decl., supra, Attachment A, the log
begins on January 31, 2004 -- in other words, after the alleged search of January 24,
2004.  Therefore, we have only Hayes' Declaration to rebut the grievances filed by
Dasta.  Accordingly, we construe the Record in favor of Dasta, as the non-moving
(continued...)

on March 28, 2004, at 11:58 o'clock a.m., and on May 23, 2004, at 12:30 o'clock

p.m.[21]  See, <u>Hayes Decl.</u>, at ¶5; see also, <u>Declaration of Jorge Castaneda ("Castaneda</u>

<u>Decl.")</u>, <u>Docket No. 69</u>, Attachment A, at unnumbered pages 33, 61.  Hayes states that

officers are required to conduct an official inmate count every day at 3:00 o'clock a.m.

During this inmate count, officers are also required to confiscate any visible

unauthorized items, even when that requires entering an inmate's cell.  See, <u>Hayes</u>

<u>Decl.</u>, at ¶5.  Hayes avers that this type of confiscation, during the official inmate

count, is not documented as a cell search.[22]  <u>Id.</u>  Dasta also alleges that Hayes read

---

(...continued)
party.

    [21]Hayes' Declaration incorrectly states that Dasta alleged four (4) searches at 3:00 o'clock a.m.  See, <u>Hayes Decl.</u>, supra, at ¶4.  Notwithstanding her statement, the Record reveals no factual dispute over the times of the searches on March 28, 2004, and May 23, 2004.  See, <u>Exhibit 1</u>, supra, at AFF325, 466.   Dasta has never alleged that those searches by Hayes occurred at any time other than over the lunch hour.

    In addition, we note that Hayes states that she was not working at 3:00 o'clock a.m., on May 23, 2004.  See, <u>Hayes Decl.</u>, supra, at ¶4.  Hayes also asserts that she was not working at 3:00 o'clock a.m., on May 30, 2004, but it appears that Dasta claims that Hayes first improperly searched his cell on May 30, 2003.  <u>Id.</u> at ¶4.

    [22]Hayes further avers that she does not recall ever confiscating items from Dasta during the official inmate count.  See, <u>Hayes Decl.</u>, at ¶5.  Because Dasta does not assert a constitutional violation, which is based on the confiscation of any contraband, this factual dispute is immaterial to our analysis.

through his legal materials, and medical records.   See, <u>Complaint</u>, <u>Docket No. 1</u>, at 5; <u>Exhibit 1</u>, supra, at AFF323, 330.   Hayes denies reading any of Dasta's paperwork, although she acknowledges that, pursuant to FMC-Rochester's search policy, she does search through legal papers during cell searches.   See, <u>Hayes Decl.</u>, supra, at ¶6.

On January 19, 2005, Dasta was transferred back to FCI-Cumberland.   His transfer paperwork again showed no restriction on his ability to travel, and reflected that he did not require any medical equipment for transport.   See, <u>Exhibit 2</u>, supra, at CRMC019.   Dasta has since been transferred to the Federal Correctional Institution, in Elkton, Ohio.   See, <u>Letter from Plaintiff</u>, <u>Docket No. 119</u>.

## III.  <u>Discussion</u>

Dasta's Amended Complaint includes the following claims: 1) that Dr. Giron, his physician at FCI-Cumberland, committed medical malpractice and was deliberately indifferent to Dasta's back condition; 2) that Shearin, the Warden at FCI-Cumberland, turned a blind eye to Dr. Giron's deliberate indifference; 3) that Hayes, an Officer at FMC-Rochester, conducted several retaliatory searches of Dasta's cell and, in doing so, was deliberately indifferent to Dasta's back condition; and 4) that Nelson and Richards, who are Officers at FMC-Rochester, were deliberately indifferent to Dasta's back condition when they transported him to a medical appointment.   As a

consequence, Dasta alleges that the Defendants have violated his rights under the

Eighth Amendment.[23]  See, <u>Amended Complaint</u>, <u>Docket No. 35</u>, at pp. 1-2, 7.[24]  The

_____

[23]After our Court of Appeals remanded Dasta's case following his first Petition for Review, Dasta was given leave to amend his Complaint, in order to assert his surviving claims.   The Court of Appeals described Dasta's surviving claims as follows:

> [W]e conclude Dasta stated the following claims against named defendants:  that his physician at FCI-Cumberland, Dr. Giron, committed medical malpractice, and was deliberately indifferent to Dasta's unstable, worsening, and painful back condition, * * * [citation omitted]; that FCI-Cumberland Warden Bobby Shearin turned a blind eye to Dr. Giron's deliberate indifference, * * * [citation omitted]; that FMC-Rochester Officer Hayes retaliated against Dasta for filing grievances by conducting a search, * * * [citation omitted]; and that FMC-Rochester Officers Howard Nelson and Bernie Richards were deliberately indifferent when they ignored the postoperative orders of Dasta's surgeon, and disregarded his injured shoulder, while transporting Dasta to the Mayo Clinic for an appointment, * * * [citation omitted].

<u>Dasta v. LeBlanc</u>, 132 Fed.Appx. 98, 100 (8th Cir. 2005).

The "Amended Complaint" submitted by Dasta contained factual allegations, as well as Exhibits, that did not appear in the Record which was previously presented to both the District Court, and the Court of Appeals.  Nonetheless, we determined that the legal claims were identical to those that were previously presented, and therefore, we allowed Dasta's "Amended Complaint," as well as the incorporated Exhibits, to serve as the pleading of Record in this case.  However, to the extent that Dasta complains of treatment at the Allegheny County Jail, or of treatment by Federal correctional

(continued...)

Defendants acknowledge that Dasta has exhausted his administrative remedies in the prison as to those claims.  See, <u>Kinyon Decl.</u>, supra, at ¶21.  Dasta seeks injunctive and declaratory relief, as well as damages.  See, <u>Amended Complaint</u>, supra, at p. 9.

Dr. Giron and Shearin move to dismiss Dasta's claims as against them, alleging a lack of personal jurisdiction.  See, <u>Rule 12(b)(2), Federal Rules of Civil Procedure</u>. Dr. Giron further moves to dismiss Dasta's claim of malpractice for lack of subject matter jurisdiction.  See, <u>Rule 12(b)(1), Federal Rules of Civil Procedure</u>.  In this respect, Dr. Giron alleges that Dasta failed to exhaust his administrative remedies, as required by the Federal Tort Claims Act ("FTCA"), <u>Title 28 U.S.C. §2675</u>.  Finally, all of the Defendants move for Summary Judgment, as to all of Dasta's claims, on the

---

(...continued)

officials who are not named as Defendants in this matter, we do not address those claims, as they are not properly before this Court.

[24]Dasta's amended Complaint nominally cites the Fifth and Fourteenth Amendments as bases for his claims, though he makes no arguments related to these Amendments.  See, <u>Amended Complaint</u>, <u>Docket No. 35</u>, at 8.  Nevertheless, a review of the substance of Dasta's Complaint reveals that his claims all relate to violations of the Eighth Amendment, for deliberate indifference to his medical needs, or to the First Amendment, for retaliatory cell searches following his filing of a grievance.

basis of qualified immunity.   See, <u>Rule 56, Federal Rules of Civil Procedure</u>.   We
address each contention in turn.

A.   <u>Sovereign Immunity</u>.   At the outset of our analysis, we note that, as a
sovereign power, the United States may be sued only to the extent that it has
consented to suit by Statute.   See, <u>United States Dept. of Energy v. Ohio</u>, 503 U.S.
607, 615 (1992); <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980).   "Sovereign
immunity is a jurisdictional doctrine, and the terms of the United States' 'consent to
be sued in any court define that court's jurisdiction to entertain the suit.'"   <u>Brown v.
United States</u>, 151 F.3d 800, 803 (8th Cir. 1998), quoting <u>FDIC v. Meyer</u>, 510 U.S.
471, 475 (1994); see also, <u>United States v. Mottaz</u>, 476 U.S. 834, 841 (1986)("When
the United States consents to be sued, the terms of its waiver of sovereign immunity
define the extent of the court's jurisdiction."), citing <u>United States v. Sherwood</u>, 312
U.S. 584, 586 (1941).

Waivers of sovereign immunity must be strictly construed in favor of the
sovereign, and may not be enlarged beyond what the language of the waiver requires.
See, <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30, 34 (1992); see also, <u>Bowen
v. City of New York</u>, 476 U.S. 467, 479 (1986); <u>Block v. North Dakota</u>, 461 U.S. 273,
287 (1983).   Thus, the doctrine of sovereign immunity holds that the United States,

and its agencies and instrumentalities -- including the Bureau of Prisons (the "BOP") -- are immune from suit, unless a waiver of such immunity has been "expressed unequivocally" by Congress. See, Manypenny v. United States, 948 F.2d 1057, 1063 (8th Cir. 1991); United States v. Dalm, 494 U.S. 596, 608 (1990); United States v. Mitchell, supra at 538; Kaffenberger v. United States, 314 F.3d 944, 950 (8th Cir. 2003).

Congress has not waived the sovereign immunity of the United States Government, or its agencies, for claims that their employees have violated the Constitution. See, Bivens v. Six Unknown Named Agents, supra at 410; Buford v. Runyon, 160 F.3d 1199, 1203 (8th Cir. 1998)("It is well settled that a Bivens action cannot be prosecuted against the United States and its agencies because of sovereign immunity."). A Federal prisoner, in a BOP facility, may bring a Bivens claim against an individual officer, subject to the defense of qualified immunity, but "the prisoner may not bring a Bivens claim against the officer's employer, the United States, or the BOP * * * with respect to the alleged constitutional deprivation, his only remedy lies against the individual." Correctional Services Corp. v. Malesko, 534 U.S. 61, 72 (2001); see also, Buford v. Runyon, supra at 1203.

Accordingly, to the extent that Dasta sues the individual Defendants in their official capacities, as a part of his <u>Bivens</u> actions, the United States is the real party in interest, and sovereign immunity bars those claims.  See, <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) (suits against public officials acting in their official capacities should be treated as suits against the public entity); <u>Elder-Keep v. Aksamit</u>, 460 F.3d 979, 986 (8th Cir. 2006)("A suit against a public officer in his official capacity is actually a suit against the entity for which the official is an agent.").  Therefore, Dasta's <u>Bivens</u> claims against the individual Defendants in their official capacities should be dismissed for lack of subject matter jurisdiction, leaving only the individual capacity claims.

      B.      <u>Motion to Dismiss Claims against Shearin, and Dr. Giron.</u>

      1.      <u>Standard of Review</u>.  Our Court of Appeals has synopsized the law, which governs the determination of our jurisdiction over persons, such as Dr. Giron and Shearin, as follows:

> In determining whether the Minnesota court had personal jurisdiction over a nonresident defendant, we must ask (1) whether the Minnesota  long-arm statute was satisfied, and (2) whether the exercise of jurisdiction over the [defendant] would violate the Due Process Clause of the Fourteenth Amendment.  Minnesota Mining & Mfg. Co. v. Nippon Carbide Indus. Co., 63 F.3d 694, 696-97 (8th Cir. 1995),

- 31 -

cert. denied, 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996).

Minnesota's long-arm statute, Minn.Stat.Ann. §543.19 (West 1988), has been interpreted to extend jurisdiction over nonresident defendants to the fullest degree allowed by the Due Process Clause of the United States Constitution. Trident Enter. v. Kemp & George, 502 N.W.2d 411, 414 (Minn.Ct.App. 1993).  This constitutional limits will dictate whether jurisdiction over [the defendant] is proper.

In order to exercise personal jurisdiction over a nonresident defendant, due process requires that such a defendant have "minimum contacts" with the forum state such that maintenance of a suit against the defendant does not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)(quoting Milliken v. Meyer, 311 U.S. 457, 464, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The nonresident defendant's conduct and connection with the forum state must be such that "he should reasonably anticipate being haled into court there," World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980), and it is essential that "'there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)(quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).  "Purposeful availment" means that the defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or party.  Id.

<u>Guinness Import Company v. Mark VII Distributors, Inc.</u>, 153 F.3d 607, 613-14 (8th Cir. 1998); <u>Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.</u>, 51 F.3d 1383, 1387 (8th Cir. 1995).

"This Court considers five factors in determining whether a district court's exercise of jurisdiction over a non-resident defendant is consistent with due process * * *." <u>Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.</u>, supra at 1387-88. "These factors are: '(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.'" <u>Stanton v. St. Jude Medical, Inc.</u>, 340 F.3d 690, 694 (8th Cir. 2003), quoting <u>Austad Co. v. Pennie & Edmonds</u>, 823 F.2d 223, 226 (8th Cir. 1987). "The first three factors are of primary importance, and the last two are 'secondary factors.'" <u>Id.</u>

"Even if the minimum contacts threshold is established, personal jurisdiction may be defeated if its exercise would be unreasonable considering such factors as (a) the burden on the defendant; (b) the interest of the forum State; (c) the plaintiff's interest in obtaining relief; (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (e) the shared interest of the several states in furthering fundamental substantive social policy." <u>St. Jude Medical, Inc. v.</u>

Lifecare Int'l, Inc., 250 F.3d 587, 591 (8th Cir. 2001), citing Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 113-14 (1987).

        2.    Legal Analysis.  "To defeat a [pretrial] motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction."  St. Paul Fire and Marine Ins. Co. v. Courtney Enterprises, Inc., 270 F.3d 621, 623 (8th Cir. 2001), quoting Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991).  Here, we find that Shearin and Dr. Giron have not had sufficient "minimum contacts" with the State of Minnesota to allow the extension of jurisdiction over their persons.[25]  See, Burger King v. Rudzewicz, supra at 474 (Due process requires that the plaintiff demonstrate that the defendant has "purposefully established 'minimum contacts' in the forum State."); International Shoe v. Washington, supra at 320 (Due process also requires that the traditional notions of "fair play and substantial justice" are not offended by an exercise of personal jurisdiction.").

---

[25]Both Dr. Giron and Shearin waived personal service by mail.  See, Rule 4(d), Federal Rules of Civil Procedure; see also, Docket Nos. 44, 46.  Waiver of personal service, however, does not preclude a defendant from contesting personal jurisdiction.  See, Rule 4(d)(1), Federal Rules of Civil Procedure.

The only contact shown in the Record, between Dr. Giron, or Shearin, and the State of Minnesota, is that Shearin authorized Dasta's transfer, from FCI-Cumberland to FMC-Rochester, based upon Dr. Giron's medical recommendation.  Dasta's claims against Dr. Giron are for medical malpractice, and for an alleged deliberate indifference to Dasta's back condition.  Dasta claims that Dr. Giron waited too long to conduct an MRI, and to recommend surgery, and that he failed to provide Dasta with appropriate treatment in the interim, such as a back brace, a hospital bed, or adequate pain medication.  See, Amended Complaint, supra, at 3-5.  Those claims are not related to his transfer -- in fact, Dasta complains that he should have been transferred sooner.  Instead, Dasta claims that Dr. Giron committed medical malpractice, and deliberate indifference, when Dasta was treated in the State of Maryland -- not in the State of Minnesota.   Accordingly, we find no evidence in this Record that Dr. Giron "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State."  See, Burger King v. Rudzewicz, supra at 475.

With regard to Shearin, we are presented with only a slightly closer case.  As Warden of FCI-Cumberland, it was Shearin who authorized Dasta's transfer to Minnesota, in reliance on Dr. Giron's medical recommendation.  Nevertheless, it is not the transfer which underlies Dasta's claims against Shearin -- Dasta contends only that

Shearin turned a blind eye to Dasta's numerous administrative grievances, during Dasta's confinement at FCI-Cumberland.   Accordingly, we are without personal jurisdiction over Shearin in this case.

In an analogous case, our Court of Appeals affirmed the dismissal, on personal jurisdiction grounds, of a Section 1983 action by an Iowa prisoner who attempted, in the District Court for the Southern District of Iowa, to sue certain Missouri prison officials who decided to transfer him to an Iowa prison.  See, Wycoff v. Nix, 994 F.2d 844, 1993 WL 176608 at *1 (8th Cir. 1993)("The Missouri prison officials lacked the requisite minimum contacts with the State of Iowa and therefore the district court correctly dismissed [the plaintiff's] claims under Fed. R. Civ. P. 12(b)(1)."), citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-6 (1980); Sanders v. United States, 760 F.2d 869, 872 (8th Cir. 1985).

The Wycoff Court held that, even if the inmate had alleged that the transfer was made in retaliation for the inmate's exercise of his First Amendment rights, "the proper forum to consider Wycoff's retaliatory transfer claim is Missouri, the state in which the alleged wrongful act occurred."  Id. at *1.  Likewise, the proper forum for Dasta's claims against Shearin is in Maryland -- the State in which Shearin allegedly turned a blind eye to Dasta's medical condition, and to his grievances.

Of course, we are mindful that, in his Declaration, Shearin attests that he lived in Sandstone, Minnesota, from June of 1987, until November of 1988.  See, Declaration of Bobby Shearin ("Shearin Decl."), Docket No. 65, at ¶5.  Shearin further avers that he has never owned real property in Minnesota, and that he has no contacts with this State outside of his prior residence.  Id.  We find that Shearin's past residency in Minnesota is wholly unrelated to Dasta's claims, thereby precluding specific personal jurisdiction in this case.  See, Johnson v. Woodcock, 444 F.3d 953, 956 (8th Cir. 2006), cert. denied, -- U.S. ---, 127 S.Ct. 217 (2006); Lakin v. Prudential Securities, Inc., 348 F.3d 704, 707 (8th Cir. 2003); Sanders v. United States, supra at 872.

Moreover, Shearin's time in Minnesota, approximately fifteen (15) years before Dasta was first incarcerated at FCI-Cumberland, does not constitute a continuous and systematic contact with this State, and is, therefore, too attenuated to justify an assertion of general personal jurisdiction.  See, Johnson v. Woodcock, supra at 956; Romak USA, Inc. v. Rich, 384 F.3d 979, 984 n.4 (8th Cir. 2004); Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1073 (8th Cir. 2004), cert. denied, 543 U.S. 1147 (2005).  As a consequence, we recommend that the Motions of Shearin and Dr. Giron to Dismiss be granted for lack of personal jurisdiction, unless a transfer of those

claims to the District of Maryland, Baltimore (Northern) Division, which plainly has personal jurisdiction over Shearin and Dr. Giron, would serve the interests of justice. Accordingly, our analysis turns to the question of transferring the venue of this action.

    3.  <u>Transfer pursuant to Title 28 U.S.C. §1631</u>.

    a.  <u>Standard of Review</u>.  Once a Federal Court has concluded that it does not have personal jurisdiction in a case, it must consider whether the action ought to be transferred to another Court where jurisdiction would exist.  The Court has a duty to address the transfer issue even if no party has expressly raised the matter. See, <u>Hays v. Postmaster General</u>, 868 F.2d 328, 331 (9th Cir. 1989).  This duty stems from the mandatory language in Title 28 U.S.C. §1631, which provides as follows:

> Whenever a civil action is filed in a court * * * and that court finds that there is a want of jurisdiction, the court **shall**, if it is in the interest of justice, transfer such action * * * to any other such court in which the action * * * could have been brought at the time it was filed * * *, and the action * * * shall proceed as if it had been filed in * * * the court to which it is transferred on the date upon which it was actually filed in * * * the court from which it is transferred."

[Emphasis added]; see, <u>Hays v. Postmaster General</u>, supra at 331 ("[W]e have held that '[a] motion to transfer is unnecessary because of the mandatory cast of section 1631's instructions'"), quoting <u>In re McCauley</u>, 814 F.2d 1350, 1352 (9th Cir. 1987).

Section 1631 was enacted in order to protect the interests of plaintiffs who have commenced their action in the wrong Court, and who face the possibility of losing their claim because of a statute of limitations defense if their action is dismissed rather than transferred.  See, Lopez v. Heinauer, 322 F.3d 507, 511 (8th Cir. 2003) ("Pursuant to §1631, this court has the power to transfer to the proper federal court a case in which we lack jurisdiction, provided that the case has been timely filed in the proper court in the first instance."), citing Hyun Min Park v. Heston, 245 F.3d 665, 666-67 (8th Cir. 2001); Gunn v. United States Dep't of Agric., 118 F.3d 1233, 1240 (8th Cir. 1997), cert. denied, 522 U.S. 1111 (1998); Billops v. Dep't of Air Force, 725 F.2d 1160, 1163 (8th Cir. 1984).

A transfer under Section 1631, rather than a dismissal, is appropriate "when a plaintiff in good faith filed in the wrong court and the statute of limitations would have run before he could refile properly."  Gunn v. United States Dep't of Agriculture, supra at 1240, citing In re Apex Oil Co., 884 F.2d 343, 346 (8th Cir. 1989); Hempstead County and Nevada County Project v. United States E.P.A., 700 F.2d 459, 463 (8th Cir. 1983).

Therefore, in order to determine whether the "interests of justice" require that a case be transferred rather than dismissed, a Court must consider whether dismissal

of the action would affect the plaintiff's vulnerability to a statute of limitations defense. If the plaintiff can still refile his action in a proper Court, before the statute of limitations expires, then a transfer pursuant to Section 1631 is unnecessary, and the case can simply be dismissed.  See, Gunn v. United States Dep't of Agric., supra at 1240 (transfer pursuant to Section 1631 not required where Plaintiff could still bring a timely action in a proper court); cf., Gray v. Lewis & Clark Expeditions, Inc., 12 F. Supp.2d 993, 999 (D. Neb. 1998)(case transferred to Court that had personal jurisdiction where it appeared that the statute of limitations expired shortly after the case was filed in the transferor Court).

On the other hand, if the action was not timely when filed in the original forum, then there is no reason to transfer it to another jurisdiction since it will only be dismissed there for untimeliness.  See, Billops v. Dep't of Air Force, supra at 1163 (action would not be transferred to the proper Court pursuant to Section 1631 "because it could not have been brought there at the time it was filed in this Court."). In the words of our Court of Appeals, "[a] transfer [pursuant to Section 1631] can remedy the mistake of filing in the wrong court, but not the mistake of filing in an untimely manner."  Id.  In addition, transfer is not merited when a plaintiff's claim would be futile, and subject to dismissal, in the transferee Court.  See, Gunn v. U.S.

Dep't of Agric., supra at 1240 ("[T]ransfer is authorized by 28 U.S.C. §1631 if the interests of justice warrant it and the court to which the case is transferred would have jurisdiction."); Mullally v. United States, 95 F.3d 12, 14 (8th Cir. 1996).

b.      Legal Analysis.  In order to determine whether the interests of justice require that this case be transferred to another court -- namely, the District of Maryland, Baltimore (Northern) Division, where Dasta's claims against Dr. Giron and Shearin arose -- we must first consider Dr. Giron's argument that the Court lacks subject matter jurisdiction, with respect to Dasta's claim for malpractice, because Dasta failed to exhaust his administrative remedies under the FTCA in a timely manner. We must also consider whether Dasta's Bivens actions, against Dr. Giron and Shearin, were time-barred when he originally filed his action.  We address each of these claims in turn.

1)      Failure to Exhaust Administrative Remedies.  Since FCI-Cumberland is a Federal entity, any suit based on its alleged negligence -- the tort principle upon which medical malpractice claims are based -- could be brought only under the Federal Tort Claims Act ("FTCA").[26]   See, Title 28 U.S.C. §§2671-

---

[26]We note that only the United States itself, and not Dr. Giron, can be sued

(continued...)

2680; Motley v. United States, 295 F.3d 820, 823-24 (8th Cir. 2002)("The FTCA

provides the exclusive statutory remedy for plaintiffs' medical malpractice claim

against PHC and its medical staff because this otherwise private medical center is

deemed a federal employee for FTCA purposes."); United States v. Smith, 499 U.S.

160, 163 (1991)("[A]n FTCA action against the Government [is] the exclusive remedy

for torts committed by Government employees in the scope of their employment");

Brown v. Armstrong, 949 F.2d 1007, 1013 (8th Cir. 1991)("[T]he FTCA is an

exclusive remedy for torts committed by federal employees acting within the scope of

their employment.").

To bring an actionable FTCA claim, however, a claimant must show that he has

previously exhausted his FTCA administrative remedies.  The exhaustion requirement

of the FTCA provides as follows:

_____

(...continued)
under the FTCA.  See, Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996)
("Employees of the United States * * * may not be sued [under the FTCA] for torts
they commit while acting within the scope of their employment.").  However, this claim
should not be dismissed because of Dasta's failure to name the United States as a
Defendant, and instead, we construe the action as having been brought against the
United States, which ultimately would be substituted as the proper Defendant.  See,
Title 28 U.S.C. §2679(d).

> An action shall not be instituted upon a claim against the
> United States for money damages for injury or loss of
> property or personal injury or death caused by the negligent
> or wrongful act or omission of any employee of the
> Government while acting within the scope of his office or
> employment, unless the claimant shall have first presented
> the claim to the appropriate Federal agency and his claim
> shall have been finally denied by the agency in writing * * *
> .

Title 28 U.S.C. §2675(a); see also, Sanders v. United States, supra at 872 ("The timely filing of an administrative claim and exhaustion of administrative remedies are jurisdictional prerequisites to suit under the [FTCA].").

Our Court of Appeals has held that the "[p]resentment of an administrative claim is jurisdictional and must be pleaded and proven by the FTCA claimant."  Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993), cert. denied, 510 U.S. 1109 (1994); Sanchez v. United States, 49 F.3d 1329, 1329-30 (8th Cir. 1995); see also, Kaminsky v. Missouri, 2007 WL 2994299 at *3 (E.D. Mo., October 11, 2007); Deering v. Bauer, 2007 WL 2023556 at *5 (D. Minn., July 10, 2007).

However, the United States Supreme Court recently rejected a similar heightened pleading standard, under the Prison Litigation Reform Act (the "PLRA").  See, Jones v. Bock, --- U.S. ---, 127 S.Ct. 910 (2007).  The exhaustion requirement of the PLRA, which was at issue in Jones v. Bock, provides as follows:

> No action shall be brought with respect to prison conditions
> under section 1983 of this title, or any other Federal law, by

> a prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are
> exhausted.

Title 42 U.S.C. §1997e(a).

Although several Circuits had determined that this provision required a prisoner litigant to affirmatively plead exhaustion, in Jones v. Bock, the Supreme Court stated that "[s]pecific pleading requirements are mandated by the Federal Rules of Civil Procedure, and not, as a general rule, through case-by-case determinations of the federal courts." Id. at 920-21, quoting Hill v. McDonough, 547 U.S. ----, 126 S.Ct. 2096, 2103 (2006); see also, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002)("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."). Accordingly, the Court concluded that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specifically plead or demonstrate exhaustion in their complaints." Id. at 921.

It is unclear if the heightened pleading standard, which was imposed by some Courts, including our Court of Appeals, under the FTCA, has survived the Supreme Court's holding in Jones v. Bock. Nonetheless, even if an FTCA plaintiff need not affirmatively plead exhaustion, it remains clear that an FTCA action may be dismissed, pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, for want of subject matter

jurisdiction, based upon a failure to exhaust administrative remedies.  See, T.L. ex rel. Ingram v. United States, 443 F.3d 956, 961 (8th Cir. 2006); Daniels v. United States, 135 Fed.Appx. 900, 901 (8th Cir. 2005); Garza v. U.S. Bureau of Prisons, 284 F.3d 930, 934 (8th Cir. 2002).

In his Complaint, Dasta alleged that he has exhausted his administrative remedies, pursuant to the PLRA, Title 42 U.S.C. §1997e, which, as noted above, expressly requires prisoner litigants to exhaust all of their available administrative remedies before seeking relief in Federal Court.  See, Booth v. Churner, 532 U.S. 731, 741 (2001)("Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures."); Porter v. Nussle, 534 U.S. 516, 532 (2002) (The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.").  Although Dasta did not explicitly cite Title 28 U.S.C. 2675(a), which separately requires exhaustion of FTCA claims, we find that, by his reference to Title 42 U.S.C. §1997e, Dasta has similarly pled exhaustion pursuant to the FTCA.

Here, Dasta is required to exhaust his administrative remedies both as a prisoner litigant, pursuant to Title 42 U.S.C. §1997e(a), and as an FTCA plaintiff, pursuant to Title 28 U.S.C. §2675(a).  Accordingly, even if an FTCA plaintiff is required to

affirmatively plead exhaustion, notwithstanding <u>Jones v. Bock</u>, we conclude that Dasta has satisfied that pleading requirement, through his reference to Title 42 U.S.C. §1997e. See, <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)("[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers[.]'"), quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972); <u>Stringer v. St. James R-1 School Dist.</u>, 446 F.3d 799, 802 (8th Cir. 2006); <u>Cline v. Herman</u>, 601 F.2d 374, 375-76 (8th Cir. 1979)(although pro se litigant's complaint failed to mention Federal Tort Claims Act, Court liberally construed complaint to assert an FTCA claim).

Having addressed the FTCA question, we proceed to Dr. Giron's Motion to Dismiss Dasta's malpractice claim, based upon Dasta's alleged failure to exhaust his administrative remedies. "In order to properly dismiss an action under Rule 12(b)(1), the challenging party must successfully attack the Complaint, either upon its face or upon the factual truthfulness of its averments." <u>Moubry v. Ind. School Dist. No. 696</u>, 951 F. Supp. 867, 882 (D. Minn. 1996), citing <u>Titus v. Sullivan</u>, 4 F.3d 590, 593 (8th Cir. 1993); <u>Osborn v. United States</u>, 918 F.2d 724, 729 n. 6 (8th Cir. 1990).

Where, as here, the Defendant brings a factual challenge to subject matter jurisdiction -- contending that the allegations in the Complaint, that are offered to

establish jurisdiction, are insufficiently supported by the facts -- the Court "may

consider matters outside the pleadings and the non-moving party does not benefit from

the safeguards of 12(b)(6)."[27]  Id.  When a plaintiff's "'allegations of jurisdictional

facts are challenged by his adversary in any appropriate manner, he must support them

by competent proof," "[a]nd * * * for that purpose the court may demand that the

party alleging jurisdiction justify his allegations by a preponderance of the evidence.'"

Zunamon v. Brown, 418 F.2d 883, 886 (8th Cir. 1969), quoting McNutt v. General

Motors Acceptance Corp., 298 U.S. 178, 189 (1936).

　　　Here, Dr. Giron asserts, in the Defendants' supporting Memorandum, that Dasta

failed to submit his FTCA claim to the BOP before filing his Complaint.   See,

---

[27]Normally, when reviewing a Rule 12(b)(6) dismissal for failure to state a claim, "we look only to the facts alleged in the complaint and construe those facts in the light most favorable to the [nonmoving party]."  Riley v. St. Louis County, 153 F.3d 627, 629 (8th Cir. 1998), cert. denied, 525 U.S. 1178 (1999), citing Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.23d 554, 556 (8th Cir. 1998); see also, Maki v. Allete, Inc., 383 F.3d 740, 742 (8th Cir. 2004).  In addition, all reasonable inferences, from the facts alleged in the Complaint, must be drawn in favor of the nonmoving party.  See, Maki v. Allete, Inc., supra at 742.  "A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief."  Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001), citing Breedlove v. Earthgrains Baking, 140 F.3d 797, 799 (8th Cir. 1998); see also, Maki v. Allete, supra at 742; Helleloid v. Ind. School Dist. No. 361, 149 F. Supp.2d 863, 866-67 (D. Minn. 2001).

Defendants' Memorandum in Support, Docket No. 59, at 11.   However, in a

Declaration which purports to support the Defendants' Memorandum, Ann Kinyon,

who is a Paralegal Specialist for the BOP, attests that, according to her review of the

Record,  Dasta "has appropriately exhausted his administrative remedies concerning

the issues he raises in his complaint."[28]   Kinyon Decl., supra at ¶21.   In his reply

Memorandum, however, Dr. Giron contends that Dasta has exhausted the prison

grievance system, see, 28 C.F.R. §§542.10-542.19, but not the administrative process

for presenting his FTCA claim to the BOP.   See, Defendants' Reply Memorandum,

Docket No. 88, at 1-2.   Dr. Giron further asserts that Dasta has an affirmative

obligation to provide documentation of the final administrative decision, which relates

to his FTCA claim, and that he has failed to meet that obligation.   Id. at 2, citing

Knuckles El v. Toombs, 215 F.3d 640, 642 (6th Cir. 2000).

To the extent that Knuckles El v. Toombs required a prisoner to affirmatively

plead exhaustion, and to submit documentation that proved exhaustion, in support of

a Section 1983 action, that case has been abrogated by the Supreme Court's holding

in Jones v. Bock.   Nevertheless, our independent research revealed some support for

---

[28]Kinyon's Declaration makes no reference to either exhaustion statute.

Dr. Giron's contention, that Dasta must provide documentation in order to prove exhaustion under the FTCA, in several cases which have been decided since <u>Jones v. Bock</u>. See, e.g., <u>Walton v. U.S. Dep't of Agric.</u>, 2007 WL 1246845 at *13 (E.D. Mo., April 30, 2007)(dismissing FTCA claim for failure to exhaust, where the plaintiff "failed to present this Court with any final agency decision regarding this issue."); <u>Banks v. United States</u>, 2007 WL 1030326 at *6 (E.D. La., March 28, 2007)("[W]ithout evidence that a FTCA claim has been presented to the appropriate agency, the FTCA claim must be dismissed."); <u>Smith v. U.S. Postal Service Inspector General</u>, 2007 WL 537712 at *2 (E.D. Ark., February 16, 2007)(dismissing FTCA claim, where the plaintiff failed to rebut a declaration, provided by the defendants, which alleged failure to exhaust). Among these cases is our Report, in <u>Jackson v. Federal Bureau of Prisons</u>, 2007 WL 843839 at *17 (D. Minn., March 16, 2007), where we recommended the grant of a Motion to Dismiss where the plaintiff "included no documentation that would suggest that he ever attempted to exhaust his [FTCA] claims[.]".

Our review of the Record reveals that Dasta has not provided any copies of "Standard Form 95," which is the prescribed form for presenting FTCA claims. See, <u>28 C.F.R. §14.2(a)</u> ("For purposes of the provisions of [Title] 28 U.S.C. §§2401(b),

- 49 -

2672, and 2675, a claim shall be deemed to have been presented when a Federal agency receives from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident * * *.").

Nevertheless, given our finding that Dasta affirmatively pled exhaustion, and given the representation made by Kinyon, we conclude that dismissal in this instance, where failure to exhaust has not been definitively established, would be improper.  See, Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007)(concluding that, when a prisoner's Complaint includes statements which suggest that the prisoner has failed to exhaust all administrative remedies, as required by the Prison Litigation Reform Act, "a district court cannot dismiss the complaint without first giving the inmate an opportunity to address the issue."), quoting Anderson v. XYZ Corr. Health Servs., 407 F.3d 674, 682 (4th Cir. 2005); Howard v. Taggart, 2007 WL 2840369 at *4 n. 2 (N.D. Ohio, September 27, 2007)(where an FTCA plaintiff failed to plead exhaustion, "[i]n light of Jones, * * * perhaps the kinder and gentler approach should be taken to allow amendment to cure this deficiency in the jurisdictional allegations[.]"); Kimbrough v. U.S. Government, 2007 WL 2746672 at *1 (N.D. Ga., September 17, 2007)(citing Jones v. Bock, and stating that, "[w]hile it is clear that a plaintiff must **prove** administrative exhaustion to succeed on a claim under the FTCA,

* * * it is not clear within the Eleventh Circuit whether that requirement requires a plaintiff to **plead** exhaustion in his complaint.")[emphasis in original].

Dr. Giron also argues, in the alternative, that the statute of limitations for Dasta's FTCA claim has run.  "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues[.]"  Title 28 U.S.C. §2401(b).  "In medical malpractice actions [under the FTCA], the claim 'accrues' when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice upon which the cause of action is based."  Reilly v. United States, 513 F.2d 147, 148 (8th Cir. 1975)[citations omitted]; see also, T.L. ex rel. Ingram v. United States, supra at 962; Motley v. United States, supra at 822.

Dr. Giron contends that Dasta's FTCA claim accrued by October 24, 2002, when Dasta was transferred from FCI-Cumberland to FMC-Rochester, and was no longer in Dr. Giron's care.  See, Defendants' Memorandum in Support, Docket No. 59, at 12.  However, Dasta filed his Complaint on August 25, 2004, less than two (2) years after his transfer.  See, Docket No. 1.  Given that Dasta has not yet provided any copies of Standard Form 95, or other evidence which would prove exhaustion, we cannot determine if he failed to present his FTCA claim for administrative review,

within the statute of limitations.   Accordingly, we find that transfer, not dismissal, is

warranted with respect to Dasta's malpractice claim.

2)   <u>Statute of Limitations</u>.   Next, with respect to Dasta's

<u>Bivens</u> action against Dr. Giron and Shearin, we must consider the timeliness of the

present action, in order to determine whether his claims merit transfer.   If Dasta's

<u>Bivens</u> action against Dr. Giron, and Shearin, had been brought in Maryland, as it

should have been, it would have been subject to a three-year statute of limitations.

See, <u>Arawole v. Gaye</u>, 2002 WL 32356684 at *1 (D. Md., February 5, 2002)("The

statute of limitations for <u>Bivens</u> actions arising in Maryland is three years."), citing

<u>Maryland Code, Courts and Judicial Proceedings, Section 5-101</u>; <u>Reinbold v. Evers</u>,

187 F.3d 348, 359 n. 10 (4th Cir. 1999)("[B]ecause there is no statute of limitations for

<u>Bivens</u> actions, the district court correctly looked to [State] law."); compare, <u>Causey</u>

<u>v. Balog</u>, 162 F.3d 795, 804 (4th Cir. 1998)(holding that the three-year statute of

limitations, which is applied to tort actions under Maryland State law, is applicable to

Section 1983 actions brought in Maryland), citing <u>Nasim v. Warden, Maryland House</u>

<u>of Correction</u>, 64 F.3d 951, 955 (4th Cir. 1995); <u>Arawole v. Gaye</u>, supra at *1 (citing

<u>Sanchez v. United States</u>, supra at 1330, for the proposition that <u>Bivens</u> actions are

governed by same statute of limitations as Section 1983 actions).

The statute of limitations governing Dasta's malpractice action against Dr. Giron, by contrast, required Dasta to file his Complaint within the earlier of five (5) years of the date on which the injury was committed, or three (3) years of the date the injury was discovered. See, Maryland Code, Courts and Judicial Proceedings, Section 5-109(a); see also, State v. Copes, 927 A.2d 426, 438 (Md. App. 2007)("An 'injury' occurs for purposes of a medical malpractice action at such time as a negligent act is coupled with some harm."), citing Hill v. Fitzgerald, 501 A.2d 27 (1985). Therefore, in assessing the timeliness of Dasta's claim, we must determine when his claims actually accrued.

The crux of Dasta's malpractice claim is that Dr. Giron knew of Dasta's back injury, but failed to promptly attend to Dasta's medical needs. When Dasta first arrived at FCI-Cumberland, on March 18, 2002, Dr. Giron conducted an initial review of his medical records. See, Dr. Giron Decl., supra, at ¶4. This marked Dr. Giron's first possible interaction with Dasta. Even if Dasta discovered his injury as early as

that date,[29] for purposes of his malpractice claim against Dr. Giron, his Complaint was filed on August 25, 2004, which was well within the three-year limitations period.[30]

The same time period applies to Dasta's potential <u>Bivens</u> claims against both Dr. Giron and Shearin.  With respect to his <u>Bivens</u> claims, Dasta contends that Dr. Giron's alleged nonfeasance rose to the level of deliberate indifference, and that Shearin turned a blind eye to Dr. Giron's alleged indifference. Even if Dasta's constitutional claims accrued against Dr. Giron and Shearin as early as March 18, 2002, he filed his Complaint well within three (3) years, and prior to the expiration of the limitations period.  However, because three (3) years have since passed, if we dismissed Dasta's Complaint outright, the statute of limitations might now bar some of his claims against Dr. Giron or Shearin. Accordingly, we conclude that the interests of justice would be served by transferring this action to the District of Maryland,

---

[29]The Record shows that Dasta filed his first grievance, complaining that he had not received any follow-up care with regard to his back injury, on April 3, 2002, just 16 days after his arrival at FCI-Cumberland, and two (2) weeks after he was first seen at sick call, and prescribed prednisone.  See, <u>Exhibit 1</u>, supra, at AFF143.

[30]Dasta originally filed his Complaint in the District Court for the District of Columbia, on  August 25, 2004.  See, <u>Docket No. 4</u>.  His case was transferred to this District on October 12, 2004.  <u>Id.</u>  Given that Dasta never actually chose this District as a forum for his lawsuit, we conclude that transfer is particularly warranted in this case.

Baltimore (Northern) Division, pursuant to Title 28 U.S.C. §1631, and therefore, we

recommend that result.[31]   Moreover, transfer accommodates the fact that Dasta did not

choose this forum, for his case was transferred here by a prior Court.   While we do

---

[31]The Defendants argue that a transfer, pursuant to Section 1631, is inappropriate in this case.   See, <u>Defendants' Reply</u>, <u>Docket No. 88</u>, at 3-4.   The Defendants acknowledge that Federal Courts are divided as to whether Section 1631 allows transfer only when subject matter jurisdiction is lacking, or whether it also permits transfer for a want of personal jurisdiction.   See, <u>Cimon v. Gaffney</u>, 401 F.3d 1, 7 n.21 (1st Cir. 2005)(noting division among Federal Courts); <u>In re Carefirst of Maryland, Inc.</u>, 305 F.3d 253, 257 n.2 (4th Cir. 2002)(same).   The Defendants ask that we adopt the former view.   We decline to do so.   In our view, the statutory text supports transfer for want of either subject matter jurisdiction, or personal jurisdiction.

We acknowledge the view of some Courts, that the legislative history of the statute focused solely on transfers based on a want of subject matter jurisdiction, and thereby counsels against transfers based on a want of personal jurisdiction.   See, e.g., <u>SongByrd, Inc. v. Estate of Grossman</u>, 206 F.3d 172, 179 n.9 (2nd Cir. 2000).   Our Court of Appeals has yet to rule on this issue, but it has been the practice of this Court, and of other District Courts in this Circuit, to transfer cases pursuant to Section 1631, where personal jurisdiction is lacking, in accordance with the plain text of the statute, and where the interests of justice require such a transfer.   See, e.g., <u>Superior Edge, Inc. v. Maricopa County Comm. College Dist.</u>, --- F. Supp.2d ---, 2007 WL 1101185 at *7 (D. Minn. 2007); <u>Wieler v. Entrenet Nutritionals, Inc.</u>, 2004 WL 2988522,at *4 (D. Minn., December 22, 2004); <u>Bell v. Imperial Palace Hotel/Casino, Inc.</u>, 200 F.Supp.2d 1082, 1092 (E.D. Mo. 2001); <u>Med-Tec, Inc. v. Kostich</u>, 980 F.Supp. 1315, 1332 (N.D. Iowa 1997); see also, <u>Eichenwald v. Small</u>, 321 F.3d 733, 736 (8th Cir. 2003)(recognizing transfer to District Court under Section 1631, based on lack of personal jurisdiction in the Court where the Complaint was originally filed). Accordingly, we conclude that transfer is appropriate in this case, and we reject the Defendants' argument that we decline to do so.

not suggest any impropriety in that transfer, as there is none, to require Dasta to refile in the District of Maryland, Baltimore (Northern) Division, and potentially lose certain of his causes of action, is plainly not in the interests of justice.  To the extent legally permissible, causes of action should be considered on their merits, and not be dismissed because of procedural traps for the unwary.  See, e.g., Johnson v. Dayton Electric Manufacturing Co., 140 F.3d 781, 784 (8th Cir. 1998)(in somewhat analogous context of default, recognizing that there is a "judicial preference for adjudications on the merits."), quoting Oberstar v. F.D.I.C., 987 F.2d 494, 504 (8th Cir. 1993).

C.    <u>The Motion of the Defendants for Summary Judgment</u>.

1.    <u>Standard of Review</u>.    Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003); <u>United Fire & Casualty Co. v. Garvey</u>, 328 F.3d 411, 413 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party.  See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 1004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003)

- 57 -

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. Univ. of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761,

768 (8th Cir. 2004); <u>Bell Lumber and Pole Co. v. United States Fire Ins. Co.</u>, 60 F.3d 437, 441 (8th Cir. 1995).

       2.   <u>Legal Analysis</u>.  The Defendants seek Summary Judgment on the basis of qualified immunity.[32]  When qualified immunity is asserted in a <u>Bivens</u> action, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all * * *."  <u>Jones v. Shields</u>, 207 F.3d 491, 494 (8th Cir. 2000), quoting <u>Wilson v. Layne</u>, 526 U.S. 603 (1999) [citations omitted].  "Only then do we ask whether that right was clearly established at the time of the alleged violation."  <u>Id.</u>; see, <u>Coonts v. Potts</u>, 316 F.3d 745, 750 (8th Cir. 2003), citing <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991).  Here, we find no constitutional violation by Hayes, Nelson, or Richards, but nonetheless, we proceed to address the question of the qualified immunity of the Defendants, in their individual capacities, in the interests of completeness.

---

[32]The Record is bereft of proof that service of process has been effected upon either Julie Hayes, or Harold Nelson, who Dasta misidentified as Howard Nelson.  See, <u>Docket Nos. 45, 48</u>.  However, neither Hayes nor Nelson has raised the issue of personal jurisdiction in the Defendants' Motion for Summary Judgment.  Accordingly, we address the merits of Dasta's claims against Hayes and Nelson.  Moreover, we note that there is nothing in the Record that would distinguish Nelson's conduct from that of Richard's, who has been properly served.  See, <u>Docket No. 47</u>.

a.    <u>The First Amendment Claim</u>.    We construe Dasta's pleadings liberally to include a First Amendment claim against Hayes, based on her allegedly retaliatory searches.    See, <u>Amended Complaint</u>, supra, at 5; <u>Plaintiff's Memorandum in Opposition</u>, supra, at 13; see also, <u>Defendants' Memorandum in Support</u>, supra at 33.

"Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  <u>Cody v. Weber</u>, 256 F.3d 764, 771 (8th Cir. 2001), citing <u>Madewell v. Roberts</u>, 909 F.2d 1203, 1206 (8th Cir. 1990).  "The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." <u>Lewis v. Jacks</u>, 486 F.3d 1025, 1029 (8th Cir. 2007), citing <u>Dixon v. Brown</u>, 38 F.3d 379, 379 (8th Cir. 1994).  To avoid Summary Judgment on his retaliation claim, Dasta "must submit 'affirmative evidence [of] a retaliatory motive.'" <u>Id.</u>, quoting <u>Wilson v. Northcutt</u>, 441 F.3d 586, 592 (8th Cir. 2006), quoting in turn <u>Crawford-El v. Britton</u>, 523 U.S. 574 (1998).

In his amended Complaint, Dasta states only that Hayes "created a subjective risk of harm through harassment of [Dasta] with frivolous room searches at 3:00 a.m. in the morning."  See, <u>Amended Complaint</u>, supra, at 5.  A review of the Record

discloses that Hayes searched Dasta's cell on May 30, 2003, and that Dasta filed a grievance based upon that search.  Dasta contends that Hayes conducted a search on January 24, 2004 -- nearly eight (8) months later -- in retaliation for his grievance. Hayes acknowledges that she was aware of Dasta's grievance against her, but denies that she conducted the search in retaliation for that grievance.[33]  We conclude that the "lack of temporal connection between the protected activity and the alleged retaliation dispels any inference of causal connection."  Lewis v. Jacks, supra at 1029, citing Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002).  As a consequence, we reject Dasta's claim that the search on January 24, 2004, was retaliatory in nature.

Dasta also contends that the search of March 28, 2004, was conducted in retaliation for his grievance relating to the search on January 24, 2004, and that the search on May 23, 2004, was conducted in retaliation for his grievance relating to the search of March 28, 2004.  Although the time between the grievance, and the allegedly retaliatory search, is temporally closer, nonetheless, as to those specific allegations,

---

[33]We note, again, that Hayes denies conducting any search of Dasta's cell on January 24, 2004, but we assume, for the purpose of our analysis, that such a search occurred.

- 61 -

Dasta still fails to present sufficient evidence of a retaliatory motive, so as to survive Summary Judgment.   We note that Hayes contends that she is responsible for conducting random searches for contraband, see, <u>Hayes Decl.</u>, supra, at ¶2, and Dasta acknowledged, in his grievances, that such cell searches were allowed pursuant to Prison policy.  See, <u>Exhibit 1</u>, supra, at AFF323; see also, <u>Hudson v. Palmer</u>, 468 U.S. 517, 529 (1984)("[W]holly random searches are essential to the effective security of penal institutions.").

Hayes also asserts that she searched Dasta's cell no more often than the cells of other inmates; an assertion that is confirmed by the Record.  <u>Id.</u> at ¶6; see also, <u>Castaneda Decl.</u>, supra, Attachment A.[34]   Accordingly, we conclude that Summary Judgment in favor of Hayes is proper, given the evidence that the searches of Dasta's cell were related to security concerns, and given Dasta's failure to provide any

---

[34]We note that the "Shakedown Log," which was submitted by the Defendants, see, <u>Castaneda Decl.</u>, supra, Attachment A, begins on January 31, 2004, and ends on June 2, 2004.  In addition, it does not include complete entries for May 15, through May 19, 2004.  Nonetheless, it includes a record of Hayes' search of Dasta's cell on both March 28, 2004, <u>id.</u> at unnumbered page 33, and on May 23, 2004.  <u>Id.</u> at unnumbered page 61.  The Shakedown Log reveals that, during that time period, Dasta's cell was searched on four (4) other occasions, by other officers, <u>id.</u> at unnumbered pages 11, 21, 27, 56, and that Hayes searched the cells of more than 75 other inmates, some of them -- like Dasta -- twice.  <u>Id.</u> at unnumbered pages 33, 35-37, 39-40, 43-48, 50-55, 57, 59-63.

evidence, other than his unsupported allegations, that Hayes conducted her searches in retaliation for his grievances.[35]  See, <u>Senty-Haugen v. Goodno</u>, 462 F.3d 876, 891 (8th Cir. 2006)(Summary Judgment proper where inmate offered only unsupported allegations that Prison officials acted with retaliatory motive when they imposed security-related speech restrictions), cert. denied, -- U.S. ---, 127 S. Ct. 2048 (2007).

Moreover, Dasta has offered no evidence to show that the cell searches would not have been conducted, but-for Hayes' alleged retaliatory motive.  See, <u>Foster v. Delo</u>, 130 F.3d 307, 308 (8th Cir. 1997), citing <u>Goff v. Burton</u>, 7 F.3d 734, 737 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994); see also, <u>Farver v. Vilches</u>, 155 F.3d 978, 979 (8th Cir. 1998)(Summary Judgment proper on retaliatory-transfer claim where inmate offered "no evidence suggesting that he was transferred because he filed a grievance, rather than because he indicated that he was not medically capable of

---

[35]Moreover, Dasta has not alleged that he was ever denied access to the grievance system.  Indeed, the Record shows that Dasta actively used the grievance system, throughout the time period of Hayes' allegedly retaliatory cell searches, to complain both about Hayes's conduct, and about the conduct of other prison staff. See, <u>Exhibit 1</u>, supra, at AFF322-30, 377-84, 464-68, 522-29.  He also filed grievances relating to his medical concerns.  See, <u>Exhibit 1</u>, supra, at AFF531.  Accordingly, Dasta has failed to allege a retaliation claim under the First Amendment.  See, <u>McDowell v. Jones</u>, 990 F.2d 433, 434 (8th Cir. 1993)(No violation of constitutional rights based on harassment by prison staff where prisoner failed to allege that he was denied access to grievance procedure).

working in the jail's kitchen."); Rouse v. Benson, 193 F.3d 936, 940 (8th Cir. 1999)(On

Motion for Summary Judgment, a Court need only consider whether there is sufficient

evidence for a reasonable fact-finder to conclude that inmate was a victim of

retaliation).  Therefore, we recommend that Hayes' Motion for Summary Judgment be

granted, with respect to Dasta's First Amendment claim.[36]

   b. The Eighth Amendment Claims.  It is well-established that

deliberate indifference to a prisoner's serious medical needs is prohibited by the Eighth

Amendment.  See, Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Albertson v. Norris,

458 F.3d 762, 765 (8th Cir. 2005).  "A prisoner's Eighth Amendment rights are

violated if prison officials show 'deliberate indifference' to the prisoner's 'serious

---

[36]We acknowledge Dasta's assertion that Hayes improperly read his legal papers during her cell searches.  Hayes admitted searching through Dasta's legal papers, but denied reading them.  "To succeed in an access-to-courts claim, a plaintiff must demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded, and that he has suffered an actual injury." Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001)[internal quotations omitted], cert. denied, 535 U.S. 1037 (2002), quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998), quoting, in turn, Lewis v. Casey, 518 U.S. 343, 353 (1996); see also, Cody v. Weber, 256 F.3d 764, 767 (8th Cir. 2001)("The taking of an inmate's legal papers can be a constitutional violation when it infringes his right of access to the courts.").  Dasta has not alleged any injury based on Hayes' conduct.  Moreover, Hayes has asserted a legitimate penological interest for searching through the papers-- that is, to insure the safety of the facility. See, Cody v. Weber, supra at 769.  Accordingly, we find that Dasta has failed to allege a constitutional claim, with respect to his legal papers.

medical needs.'"   Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir. 2003), quoting

Estelle v. Gamble, supra at 106.   To prevail on a claim of constitutionally inadequate

medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious

medical needs and (2) that the prison officials actually knew of but deliberately

disregarded those needs." Dulaney v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997),

citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Crow v. Montgomery, 403

F.3d 598, 602 (8th Cir. 2005); Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003);

Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).   "As long as this threshold is not

crossed, inmates have no constitutional right to receive a particular or requested

course of treatment, and prison doctors remain free to exercise their independent

medical judgment." Dulaney v. Carnahan, supra, citing Long v. Nix, 86 F.3d 761, 765

(8th Cir. 1996).

"Deliberate indifference may be manifested by prison doctors in responding to

the prisoner's needs or by prison officials in intentionally denying or delaying access

to medical care or intentionally interfering with prescribed treatment." Meloy v.

Bachmeier, 302 F.3d 845, 848 (8th Cir. 2002).   However, "[t]he prisoner must show

more than negligence, more even than gross negligence, and mere disagreement with

treatment decisions does not rise to the level of a constitutional violation." Jolly v.

Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000), quoting Estate of Rosenburg v. Crandell, supra at 37; see also, Smith v. Clarke, 458 F.3d 720, 724 (8th Cir. 2006); Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir. 1999)("'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'"), quoting Dulany v. Carnahan, supra at 1239; DeGidio v. Pung, 920 F.2d 525, 532 (8th Cir. 1990)("[T]he eighth amendment does not transform medical malpractice into a constitutional claim.").

Our initial inquiry focuses on whether Dasta suffered from an objectively serious medical need, and whether the Defendants knew about that need, but deliberately disregarded it. See, Jolly v. Knudson, supra at 1096. A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Vaughn v. Greene County, 438 F.3d 845, 851 (8th Cir. 2005), quoting Pool v. Sebastian County, Arkansas, 418 F.3d 934, 944 (8th Cir. 2005), quoting in turn Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir. 2006).

Dasta meets the first prong of the test, as the Defendants do not dispute that he received a diagnosis of spondylolisthesis, which can be a benign condition, but which, here, eventually required surgery. See, Grayson v. Ross, supra at 809, citing Aswegen

v. Henry, 49 F.3d 461, 464 (8th Cir. 1995)("To constitute an objectively serious medical need or deprivation of that need * * * the need or deprivation alleged must either be obvious to the layperson or supported by medical evidence, like a physician's diagnosis."), citing, in turn, Bayerbach v. Sears, 49 F.3d 1324, 1326-1327 (8th Cir. 1995); Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991).  We proceed, then, to the second prong of analysis, which requires that we closely examine the Record to determine whether the Defendants exhibited deliberate disregard for Dasta's medical needs.  See, Grayson v. Ross, supra at 808-09.

        1)    The Defendants Nelson and Richards.  Aside from Dasta's bare allegations, there is simply no evidence, in this Record, that Nelson and Richards deliberately disregarded his medical needs.  Dasta argues that Nelson and Richards acted with deliberate indifference, when they transported him to the Mayo Clinic, on April 27, 2004, and he bases that claim solely on the Defendants' failure to provide him with a wheelchair.  See, Amended Complaint, supra, at 6.  Dasta contends that he should have been provided with a wheelchair for the entirety of the transport, and that he was unable to walk while restrained.  According to Dasta, when Nelson and Richards supported him by his arms, they caused further injury to his healing back,

and to his previously injured shoulder.  Nelson and Richards, for their part, deny that Dasta exhibited any difficulty walking from the van to the clinic.

Notwithstanding this factual dispute, Dasta has failed to establish a trialworthy issue.  Although "the failure to provide a wheelchair for an inmate may constitute deliberate indifference to a serious medical need in some circumstances," <u>Shakka v. Smith</u>, 71  F.3d 162, 167 (4th Cir. 1995), citing <u>Weeks v. Chaboudy</u>, 984 F.2d 185, 187-88 (6th Cir. 1993); <u>Cummings v. Roberts</u>, 628 F.2d 1065, 1068 (8th Cir. 1980), the actions alleged by Dasta do not rise to the level of cruel and unusual punishment, as determined by Courts in this Circuit.  In <u>Cummings v. Roberts</u>, supra at 1068, our Court of Appeals found that a prisoner had pled sufficient facts to state a claim for an Eighth Amendment violation, when he alleged that prison officials had deliberately denied him use of his wheelchair, forcing him to crawl on the floor of his cell.  Cf., <u>Guiddy v. Terhune</u>, 90 Fed.Appx. 592, 600 (3d Cir. 2004)(Prisoner's allegation that correctional officer maliciously seized his wheelchair without instructions from a doctor for the purpose of causing unnecessary pain was sufficient to state a claim of deliberate indifference to serious medical needs under the Eighth Amendment); <u>Weeks v. Chaboudy</u>, supra at 187 (violation of Eighth Amendment to deprive paraplegic inmate wheelchair with knowledge that he could not move without one).

- 68 -

In contrast, mere negligence does not constitute a violation of the Eighth Amendment.  See, <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Johnson v. Hamilton</u>, 452 F.3d 967, 973 (8th Cir. 2006); <u>Madison-Bey v. Correctional Medical Services</u>, 180 Fed.Appx. 608 at *1 (8th Cir. 2006).   At most, Dasta has alleged that Nelson and Richards were negligent because they did not recognize his need for a wheelchair during a single transport, and because they supported Dasta by his arms.[37]  Such claimed negligence, even if proved, does not amount to a constitutional violation.

Moreover, none of Dasta's physicians ever prescribed the use of a wheelchair.  Even on January 31, 2004, just four (4) days after Dasta's surgery, his discharge report noted that he made use of a four-wheeled walker to aid his mobility.  It is true that "intentionally interfering with * * * treatment once prescribed" is a violation of the Eight Amendment, <u>Estelle v. Gamble</u>, supra at 104-05, and "[p]rison officials cannot substitute their judgment for a medical professional's opinion."  <u>Meloy v. Bachmeier</u>, supra at 849, citing <u>Zentmyer v. Kendall County</u>, 220 F.3d 805, 812 (7th Cir. 2000).

_____

[37]Notably, the Record shows that, as of April 27, 2004,  Dasta was capable of walking without a wheelchair, up to three (3) miles per day, albeit in shorter increments. Radiographs of Dasta's lumbar region, which were taken on April 27, 2004, and again on May 10, 2004, showed no injury to his healing spine, and therefore, they fail to substantiate his claims against Nelson and Richards.  On both April 27, and May 10, 2004, Dasta's fusion was solid and his postoperative prognosis was excellent.

In this case, however, since no physician recommended that Dasta use a wheelchair, Dasta cannot assert a constitutional claim based upon the Defendants' failure to provide one.   There is simply no evidence that Nelson and Richards interfered with Dasta's prescribed course of treatment.

Although Dasta believes that he should have been prescribed a wheelchair, our Court of Appeals has observed that a "mere disagreement with treatment decisions does not rise to the level of a constitutional violation," Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006), citing Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); Williams v. Campbell, 25 Fed.Appx. 477, 479 (8th Cir. 2001) (Inmate failed to show an Eighth Amendment violation based on the seizure of his medically prescribed cotton blankets and boots); Rowe v. Norris, 198 Fed.Appx. 579, 581 (8th Cir. 2006)(No Eighth Amendment violation because inmate disagreed with physician's choice of medication); Prater v. Dep't of Corr., 11 Fed.Appx. 668, 668 (8th Cir. 2001)(No Eighth Amendment violation where inmate demanded boots, rather than insoles, for injured foot), and Dasta's conclusory assertions, and his disagreements with his prescribed treatment, are insufficient to create a material issue of fact.  See, Jones v. Norris, 310 F.3d 610, 612 (8th Cir. 2002); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994).  Accordingly, after our thorough review, we find no

manifestation of deliberate indifference that is sufficient to state a claim for an Eighth Amendment violation against Nelson and Richards.   As a result, we recommend that their Motion for Summary Judgment be granted.

2)   <u>The Defendant Hayes</u>.   As we have noted, Dasta's Amended Complaint states that Hayes "created a subjective risk of harm through harassment of [Dasta] with frivolous room searches at 3:00 a.m. in the morning."   See, <u>Amended Complaint</u>, supra, at 5.   Dasta contends that the execution of those searches amounted to deliberate indifference to his medical condition.   In essence, Dasta complains that he was in a great deal of pain, due to his back condition, both before and after his surgery, and that Hayes' cell searches, in the middle of the night, disrupted his sleep and exacerbated his suffering.   Dasta has only alleged that Hayes entered his cell at 3:00 o'clock a.m. on two (2) occasions:   May 30, 2003, and January 24, 2004.[38]   Accordingly, we conclude that only those two (2) searches are relevant to Dasta's Eighth Amendment claim against Hayes.

---

[38]Again, we note that Hayes denies being on duty at 3:00 o'clock a.m., on January 24, 2004, but for purposes of our analysis, we construe the Record in favor of Dasta, the non-moving party.

Given this Record, Dasta has failed to present any evidence that Hayes acted with deliberate disregard for his medical condition.  Dasta does not allege that Hayes denied or delayed his access to treatment.  Instead, his claim, at most, asserts that she intentionally interfered with his prescribed course of treatment.  Dasta alleges that he was at FMC-Rochester to receive treatment for his back condition, and that Hayes' conduct "ha[d] no role in [his] recovery" from surgery.  See, <u>Exhibit 1</u>, supra at AFF324.  Dasta has not alleged that Hayes touched him when she entered his cell on either May 30, 2003, or January 24, 2004, nor that her actions violated any Prison policy.  He alleges only that her actions woke him from sleep, and that his rest was an important part of his recovery.

The Defendants, for their part, incorrectly assert that "courts have not recognized an interruption of sleep as an injury."  See, <u>Defendants' Memorandum in Support</u>, supra, at 36.  Notwithstanding that assertion, some Courts have concluded that the constant illumination of cells, which deprives inmates of the ability to sleep, can rise to the level of an Eighth Amendment violation.  See, <u>Shepherd v. Ault</u>, 982 F. Supp. 643, 645-46 (N.D. Iowa 1997)(collecting cases).   Nevertheless, we cannot conclude that Dasta has asserted a cognizable claim, because the deprivation of sleep, which was allegedly suffered by Dasta, does not rise to the level of cruel and unusual

punishment, as recognized by Courts in this Circuit.  See, <u>Key v. McKinney</u>, 176 F.3d 1083, 1086 (8th Cir. 1999)(holding that a 24-hour restraint policy did not violate Eighth Amendment as deliberately indifferent to inmate's health or safety, even where restraints made it difficult to sleep or use toilet); <u>Ferguson v. Cape Girardeau County</u>, 88 F.3d 647, 650 (8th Cir. 1996)(holding that Pre-Trial confinement for fourteen (14) days in constant illumination did not constitute punishment in violation of Due Process); <u>O'Leary v. Iowa State Men's Reformatory</u>, 79 F.3d 82, 84 (8th Cir. 1996)(No Eighth Amendment violation where inmate forced to sleep on cement slab for four (4) days); <u>Williams v. Delo</u>, 49 F.3d 442, 445-46 (8th Cir. 1995)(No Eighth Amendment violation where inmate failed to allege any evidence that his health was impaired as a result of four (4) day confinement in a cell without clothes or bedding); <u>Amerson v. Simmons</u>, 2007 WL 1231668 at *1 (E.D. Mo., April 26, 2007)(No Eighth Amendment violation where inmate alleged that he was forced to sleep for one (1) night on a steel bunk, without a mattress, despite gunshot wound in back); <u>Warren v. Missouri Dep't of Corr.</u>, 2006 WL 3690751 at *3 (E.D. Mo., December 12, 2006)(No Eighth Amendment violation where inmate forced to sleep on a floor mat, which aggravated lower back pain); <u>Hutchings v. Corum</u>, 501 F.Supp. 1276, 1293 (D.C. Mo. 1980)(No constitutional violation despite all-night illumination and high noise level at

night, where inmates failed to allege "evidence indicating that the inmates are unable to sleep at all or that they have developed psychological or physiological problems."); compare Shepherd v. Ault, supra at 647 (Motion for Summary Judgment denied where one inmate had spent 283 nights in disciplinary detention under constant illumination).

Here, Dasta has provided no evidence that his recovery from surgery was in any way interrupted by Hayes' searches. Indeed, the Record shows that his recovery was free of complications, that he consistently reported less pain to his physicians, and that he made excellent progress in regaining his mobility. Nor has Dasta shown that Hayes violated any physicians' orders by interrupting his sleep, in any manner that would properly amount to intentional interference with his medical treatment. Dasta has failed, therefore, to assert a cognizable claim against Hayes under the Eighth Amendment.

Moreover, to the extent that Dasta challenges the Prison's policy of conducting inmate counts at 3:00 o'clock a.m., it is his burden to demonstrate that the policy is not reasonably related to a legitimate penological interest. See, Orebaugh v. Caspari, 910 F.2d 526, 527-28 (8th Cir. 1990), citing Washington v. Harper, 494 U.S. 210 (1990); see also, Wishnatsky v. Schuetzle, 141 F.3d 1172, 1172 (8th Cir. 1998)

[Table]; Muhammad v. King, 21 F.3d 432, 432 (8th Cir. 1994)[Table].  Dasta has made no such showing.  Accordingly, we recommend that Hayes' Motion for Summary Judgment, with respect to Dasta's Eighth Amendment claims, be granted.

c.    Qualified Immunity.    Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, Wilson v. Layne, supra at 609; Young v. Harrison, 284 F.3d 863, 866 (8th Cir. 2002); Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken."  Wilson v. Layne, supra at 614.  The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent."  Anderson v. Creighton, 483 U.S. 635, 641 (1987).

Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not protect the plainly incompetent or those who knowingly violate the law.'" <u>Bagby v. Brondhaver</u>, 98 F.3d 1096, 1098 (8th Cir. 1996).

Here, even though we have concluded that Nelson and Richards' treatment of Dasta did not violate the Constitution, we further conclude that, even if they had, they are clearly entitled to qualified immunity, as the unlawfulness of that treatment was far from apparent.  See, <u>Moody v. Proctor</u>, 986 F.2d 239, 241-42 (8th Cir. 1993); <u>cf.</u> <u>Cummings v. Roberts</u>, supra at 1068; <u>Weeks v. Chaboudy</u>, supra at 187. Accordingly, the Motion for Summary Judgment should also be granted under the doctrine of qualified immunity, but only as to Nelson and Richards, and not as to Hayes.

As to Hayes, our Court of Appeals established, as early as 1992, that retaliatory cell searches violate a prisoner's constitutional rights. See, <u>Sanders v. Brownlee</u>, 72 F.3d 134 (8th Cir. 1995)[Table], and <u>Harding v. Vilmer</u>, 72 F.3d 91, 91 (8th Cir. 1995), citing <u>Scher v. Engelke</u>, 943 F.2d 921, 925 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992). Therefore, if we had found that Hayes violated Dasta's constitutional rights by conducting retaliatory cell searches, Hayes would not be entitled to qualified immunity. Nevertheless, because we conclude that Hayes' conduct did not violate the

Constitution, we recommend that her Motion for Summary Judgment be granted, on the merits.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Motion of Defendants Shearin and Giron to Dismiss for lack of Personal Jurisdiction [Docket No. 58] be GRANTED, but only to the extent that the Plaintiff's action against them be transferred to the District of Maryland, Baltimore (Northern) Division.

2. That the Defendants' Motion for Summary Judgment [Docket No. 58], as to Dasta's claims against Shearin and Giron be DENIED, as moot.

3. That the Defendants' Motion for Summary Judgment [Docket No. 58], as to Dasta's claims against Hayes, Nelson, and Richards, be GRANTED.

4. That the Defendants' Motion for Summary Judgment [Docket No. 58], as to Dasta's claims against Nelson and Richards, be GRANTED, in the alternative, on the basis of qualified immunity.


Dated:  November 15, 2007                    s/Raymond L. Erickson
                                             Raymond L. Erickson

- 77 -

CHIEF U.S. MAGISTRATE JUDGE

NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 3, 2007,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 3, 2007,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.